PAUL A. BONIN, Judge.
_JjThe trial court accepted Terrell Harris’ guilty plea to the offense of simple possession of cocaine. Pleading under Crosby, Mr. Harris reserved his right to appeal the trial court’s adverse pretrial rulings which had denied his motion to suppress the evidence of the cocaine and the motion to suppress his statement.[1] Mr. Harris argues that the police did not have reasonable suspicion under Terry to stop him for questioning during which cocaine was discovered in his mouth. He further argues that his ensuing incriminating statement must also be suppressed because either the warning given to him was constitutionally deficient under Miranda or it was the “fruit of the poisonous tree” under Wong Sun. The prosecution argues in response that the police had reasonable suspicion to stop Mr. Harris and that the trial court’s ruling denying suppression of the statement was not in error or, if it was error, it was harmless error under Arizona v. Ful-minante.
Upon our review of the two rulings,[2] we first conclude that the trial judge did not *908 abuse her discretion in finding that the police had reasonable suspicion to stop Mr. Harris and that as a matter of law the police-interference with Mr. Harris |2was reasonable and the cocaine discovered in his mouth would be admissible at a trial and thus affirm that ruling. We next conclude, however, that the trial judge abused her discretion in her application of the controlling law in finding that the rights-warning given to Mr. Harris following the cocaine’s discovery and his consequent arrest provided him with the absolute prerequisites of a sufficient Mmmdo-warning and, accordingly, reverse that ruling.
Ordinarily, upon such a finding we would vacate the guilty plea and remand for a trial. Because, however, it is not evident that the suppression of the statement (but not the evidence of the cocaine) would necessarily impel Mr. Harris to withdraw his guilty plea, we only reverse the trial court’s ruling on Mr. Harris’ motion to suppress his statement and remand the matter to the district court for further proceedings to afford Mr. Harris, within thirty days of the finality of this judgment, to file a motion to withdraw his guilty plea. If he timely files such a motion, the trial court shall permit him to withdraw his guilty plea and proceed to a trial on the merits at which the cocaine evidence seized from his mouth would be admissible. We explain our conclusions below.
I
In this Part we explain our conclusion that the police had reasonable suspicion to conduct a Terry-stop of Mr. Harris such that the trial court’s denial of the suppression of the cocaine discovered during the stop was correct. First, we will address the burden of proof before the trial court and the applicable exclusionary rule considerations arising out of the Fourth Amendment and Louisiana’s constitution. We will then discuss the facts which were developed at |sthe hearing on the motions to suppress and explain next the trial judge’s application of the “reasonable suspicion” test to the facts. Finally, we will address the standards under which we review the trial court’s ruling.
A
At the suppression hearing, the prosecution bears the burden of proving the admissibility of evidence seized without a warrant. La.C.Cr.P. Art. 703 D. Typically, unless justified by narrowly drawn exceptions to the warrant requirement, searches and seizures conducted without warrants issued on probable cause are per se unreasonable. State v. Surtain, 09-1835, p. 7 (La.3/16/10), 31 So.3d 1037,1043, citing Minnesota v. Dickerson, 508 U.S. 366, 372, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993). The seizure of evidence which is in plain view is one of those exceptions so long as the prior intrusion is itself justified by one of the recognized exceptions. See Coolidge v. New Hampshire, 403 U.S. 443, 465, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971) (“It is well established that under certain circumstances the police may seize evidence in plain view without a warrant.”). “Where the initial intrusion that brings the police within plain view of such an article is supported, not by a warrant, but by one of the recognized exceptions to the warrant requirement, the seizure is also legitimate.” Id. And, of course, one of the best known exceptions is the warrantless investigatory stop based upon reasonable suspicion. See Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (investigatory stop must be based upon reasonable suspicion that the individual has committed, or is about to commit, an offense).
The Fourth Amendment to the U.S. Constitution, applicable to the states *909 through the Fourteenth Amendment, protects the right of the people “against unreasonable searches and seizures.” U.S. Const. Amend. IV; see also Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). The Louisiana Constitution, too, protects “persons, Lproperty, communications, houses, papers, and effects against unreasonable searches, seizures, or invasions of privacy.” La. Const. Art. 1, § 5. Indeed, the protection against unreasonable searches and seizures under the state constitution is in limited circumstances even greater than that under the federal constitution. See State v. Tucker, 626 So.2d 707 (La.1993) (see discussion, post).
“Reasonableness is always the touchstone in striking the balance between legitimate law enforcement concerns, such as officer safety, and protected individual privacy interests.” State v. Bell, 09-574, p. 14 (La.App. 4 Cir. 12/9/09), 28 So.3d 502, 512. Accordingly, any inquiry under the Fourth Amendment and Article 1, Section 5 always centers on reasonableness.
Thus, in this case the prosecution is obliged not only to establish that the cocaine was in plain view but also that the preceding police intrusion was reasonable. The point determinative of the police intrusion for purposes of the Fourth Amendment and of Louisiana’s similar protection is, however, slightly but importantly different.
The governmental intrusion required for triggering a Fourth Amendment inquiry includes the necessary (but not sufficient) component that “a person is ‘seized’ only when, by physical force or show of authority, his freedom of movement is restrained.” U.S. v. Mendenhall, 446 U.S. 544, 553, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) (emphasis added); see also California v. Hodari D., 499 U.S. 621, 627-628, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991). Thus, “a person has been ‘seized’ within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed he was not free to leave.” Mendenhall, 446 U.S. at 554, 100 S.Ct. 1870. In the absence of restraint of the person imposed by physical force or show of authority there is no “foundation whatever for invoking constitutional safeguards.” Id. at |s553, 100 S.Ct. 1870. “Mendenhall establishes that the test for existence of a ‘show of authority’ is an objective one.” Hodari D., 499 U.S. at 628, 111 S.Ct. 1547. The test is “not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer’s words and actions would have conveyed that to a reasonable person.” Id. And even “with respect to a show of authority as with respect to application of physical force,” a “seizure” does not occur unless the subject yields. Id. at 626, 111 S.Ct. 1547.
The governmental intrusion required for triggering an Article 1, Section 5 inquiry is, however, somewhat different. For the purposes of the Louisiana constitutional protection, Hodari D. only sets the limits for determining whether an actual stop has occurred. See Tucker, 626 So.2d at 712. The Hodari D. requirement that there must be an “actual stop” before property is abandoned or discarded in order to trigger any inquiry under the Fourth Amendment does not, however, fully dispose of the inquiry under Louisiana’s constitution. Id. Because citizens of Louisiana have “greater protections” than those provided by the Fourth Amendment, her citizens have “additional protections” from governmental intrusion, including the protection of individuals not only from an “actual stop” but also from an “imminent actual stop.” Id. (emphasis in original), explicitly relying on State v. Belton, 441 So.2d 1195 (La.1983).
*910 An imminent actual stop “is only when the police come upon an individual with such force that, regardless of the individual’s attempt to flee or elude the encounter, an actual stop of the individual is virtually certain.” Tucker, 626 So.2d at 712 (emphasis in original). Illustrative of the factors to be used in assessing whether the force police used was virtually certain to result in an actual stop include (1) the officers’ proximity to the individual at the outset of the encounter, (2) whether the individual is surrounded by officers, (3) whether the officers are | ^approaching with weapons drawn, (4) the mobility of the police vis-a-vis the individual, (5) the location and characteristics of the area of the encounter, and (6) the numbers of officers involved in the encounter. Id. at 712-713. Thus, for the purposes of Louisiana constitutional law, the intrusion can occur as early as an imminent actual stop.
B
We turn now to a discussion of the facts. At the outset, however, we emphasize that only one witness, Chris Durning, a New Orleans police detective, testified. Mr. Harris did not avail himself of the provisions of La.C.Cr.P. Art. 703 E(l) and introduced no evidence to contradict Detective Durning’s testimony.[3]
Detective Durning testified that on November 4, 2010, he and Detectives Andy Roccaforte and Mike Delpharez of the First District Narcotics Division were sur-veilling the 400 block of South Jefferson Davis Parkway in Mid-City, an area described by him as known for high drug activity. The officers were in plain clothes and driving unmarked vehicles.
Detective Durning explained that the surveillance was set up based upon information from a confidential informant supplied earlier that morning to Det. Rocca-forte that drugs were being used and sold inside the residence. Det. Durning explained that he considered Mr. Harris’s action suspicious — putting on a shirt, running across Jefferson Davis Parkway, constantly looking over his shoulder to look back at the door he just came from. Det. Durning thought that Mr. Harris had possibly robbed the people in the house or was dealing narcotics.
17As Det. Durning sat in his vehicle on Baudin Street, he observed Mr. Harris “run out of the residence, put a shirt on, and look backwards and continue to run looking all over the place.” Det. Durning did not know whether Mr. Harris had robbed the place or what was going on, so he decided to follow Mr. Harris in his unmarked vehicle. Det. Durning and the other officers followed Mr. Harris through the neighborhood. When Mr. Harris reached South Pierce Street, the officer observed him sit on the steps of a residence also known for high narcotic activity. Mr. Harris sat on the steps looking around like he was waiting for someone. He then left the steps and went to a corner store, looked into the window and then returned to the steps. During this time, Mr. Harris removed his shirt revealing a white T-shirt.
At that point, Det. Durning called for a marked police unit. Officer Gunther exited her unit and approached Mr. Harris. Det. Durning parked his vehicle a few blocks away and approached Mr. Harris on foot. When Det. Durning caught up to Mr. Harris, he asked Mr. Harris what he *911 was doing and why was he running from the house. Det. Durning was trying to find out if anything serious had occurred. As Mr. Harris began to answer him, Det. Durning observed in Mr. Harris’ mouth cocaine in a clear wrapping. Det. Durning recognized the substance as crack cocaine. Det. Durning told Mr. Harris: “I know you got crack in your mouth” whereupon Mr. Harris attempted to flee. Det. Durn-ing grabbed Mr. Harris and, for Mr. Harris’ own safety, told him to “spit it out.” Mr. Harris complied and spit out six packets of cocaine.
C
From Det. Durning’s testimony we clearly see that he and the other officers were effecting an imminent actual stop of Mr. Harris before the cocaine was Isobserved in Mr. Harris’ mouth. Thus, the prosecution was required to establish that at the moment before the observation of the cocaine the police officers had the requisite reasonable suspicion under Terry, supra, to conduct an investigatory stop of Mr. Harris.
“A law enforcement officer may stop a person in a public place whom he reasonably suspects is committing, has committed, or is about to commit an offense and may demand of him, his name, address, and an explanation of his actions.” La.C.Cr.P. art. 215 A; see also Terry, supra. “Reasonable suspicion” sufficient to effect a stop has been defined as something less than probable cause for arrest: a reviewing court must look to the facts and circumstances of each case to determine whether a detaining officer had sufficient facts within his knowledge to justify an infringement of the suspect’s rights. See State v. Williams, 07-0700, p. 11 (La. App. 4 Cir. 2/13/08), 977 So.2d 1101, 1111.
 In assessing the reasonableness of an investigatory stop, the court must balance the need for the stop against the invasion of privacy it entails and consider the totality of the circumstances in determining whether reasonable suspicion exists. See State v. Marzett, 09-1080, pp. 5-6 (La.App. 4 Cir. 6/9/10), 40 So.3d 1204, 1208. The detaining officers must have knowledge of specific articulable facts which, when taken together with rational inferences from those facts, reasonably warrant the stop. Id. The officer’s past experience, training and common sense may be considered in determining if his inferences from the facts at hand were reasonable, and deference should be given to the experience of the officers present at the time of the incident. Id. “A hunch or suspicion is simply insufficient to establish reasonable grounds to stop a person.” State v. Lange, 02-0477, p. 7 (La.App. 4 Cir. 11/6/02), 832 So.2d 397, 401.
19An individual’s presence, in an area of expected crime, standing alone, is of course insufficient to support a reasonable, particularized suspicion that a person is involved in criminal activity. See Illinois v. Wardlow, 528 U.S. 119, 124, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000); Brown v. Texas, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979). But we have recognized that the reputation of an area is an articulable fact upon which an officer may rely in determining reasonable suspicion. See State v. Ratliff, 98-0094, p. 3 (La.App. 4 Cir. 5/19/99), 737 So.2d 252, 254. Inquiry into the criminal character of an area is a legally relevant contextual consideration when analyzing a Terry stop. See Adams v. Williams, 407 U.S. 143, 144, 147-48, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). See also, e.g., State v. Ganier, 591 So.2d 1328, 1330 (La.App. 4 Cir.1991). And we accept that the stop took place in an area with a *912 reputation for high crime[4] and consider that as one circumstance in the totality of the circumstances surrounding the stop.
“The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape.” Adams, 407 U.S. at 145-46, 92 S.Ct. 1921. On the contrary, as the Supreme Court explained in Adams, the Terry case “recognizes that it may be the essence of good police work to adopt an intermediate response.” Id. “A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer |Tnat the time.” Id. See also State v. Francis, 10-1149, pp. 6-7 (La.App. 4 Cir. 2/16/11), 60 So.3d 703, 709.
Det. Durning testified that he found Mr. Harris’s behavior suspicious in that Det. Durning did not know whether Mr. Harris had robbed the house he exited or if Mr. Harris was in some distress. Under the totality of the circumstances, Det. Durning had a reasonable, objective and particularized basis for detaining and questioning Mr. Harris. Based upon Det. Durning’s undisputed testimony, the trial judge concluded that there was reasonable suspicion for an investigatory stop. Thus, Det. Durning’s intrusion — prior to his observation of the cocaine in Mr. Harris’ mouth — would be reasonable. And as a result of his reasonable intrusion the detective observed the cocaine in plain view.
D
In light of the uncontradicted testimony of Det. Durning, the trial-court judge denied his motion to suppress the evidence. We ultimately review a finding of reasonableness in the context of correctly applying the exclusionary rule under the de novo standard. See State v. Pham, 01-2199, p. 4 (La.App. 4 Cir. 1/22/03), 839 So.2d 214, 218. Aside from the ultimate determination of reasonableness, a trial court’s determination of a motion to suppress evidence is entitled to great weight and will not be set aside absent an abuse of discretion. See State v. Wells, 08-2262, p. 5 (La.7/6/10), 45 So.3d 577, 581; State v. Pham, supra.
We agree that the officers’ prior intrusion was reasonable in that they possessed reasonable suspicion, and Det. Durning articulated the factual support for their suspicion. Therefore, we find no abuse of discretion in the trial court’s |1TruIing that the evidence of the cocaine would be admissible at trial or, stated another way, would not be suppressed.
*913 _±L2n
In this Part we explain why we find that the prosecution did not carry its burden at the statement-suppression hearing which would have precluded the introduction or other use of Mr. Harris’ statement at his trial.[5] We first examine the factual circumstances under which the statement was made and the statement itself. We then address the burden of proof on the motion to suppress the statement and the general law applicable to an adequate Miranda-warning. Next, we contrast the detective’s warning to Mr. Harris as he related it during the hearing with the absolute prerequisites of a constitutionally sufficient warning in order to highlight the deficiency in the warning given to Mr. Harris by Detective Durning. We then turn to our rejection of the trial judge’s finding regarding the detective’s knowledge of a sufficient warning and why it does not suffice for the deficiency in the warning given. Finally, we consider the effect of the error on Mr. Harris’ guilty plea.
A
After observing the cocaine in Mr. Harris’ mouth, Det. Durning placed him under formal arrest. The detective then advised Mr. Harris of some rights; he recited those rights from his memory. Following the advice of those rights, Mr. Harris admitted that he acquired the cocaine from the house which the officers first had under surveillance.
I13B
“If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel.” Miranda v. Arizona, 384 U.S. 436, 475, 86 S.Ct. 1602,16 L.Ed.2d 694 (1966), citing to Escobedo v. State of Illinois, 378 U.S. 478, 490, n. 14, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964). “Since the State is responsible for establishing the isolated circumstances under which the interrogation takes place and has the only means of making available corroborated evidence of warnings given during incommunicado interrogation, the burden is rightly on its shoulders.” Id. (emphasis added). See also La.C.CR.P. Art. 703 D (“the state shall have the burden of proving the admissibility of a purported confession or statement by the defendant”); State v. Thompson, 399 So.2d 1161,1167-1168 (La.1981).
Thus, a defendant’s “statement during a custodial interrogation in inadmissible at trial unless the prosecution can establish that the accused ‘in fact knowingly and voluntarily waived Miranda rights’ when making the statement.” Berghuis v. Thompkins, — U.S. — , 130 S.Ct. 2250, 2260, 176 L.Ed.2d 1098 (2010), quoting North Carolina v. Butler, 441 U.S. 369, 373, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979).
“Voluntary” waiver is distinguishable from “knowing” waiver. “[Wjaiver must be ‘voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.’ ” Berghuis, — U.S. at — , 130 S.Ct. at 2260, quoting Moran v. Burbine, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986). We are not here concerned with an allegation that Mr. Harris’ statement was involuntary. See, e.g., Colorado v. Connelly, 479 U.S. 157, 168, *914 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). We are, instead, concerned with whether his waiver was a “knowing” waiver which requires inquiry into whether the statement was “ ‘made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.’ ” Id.
A proper Miranda warning contains four separate parts. Prior to a suspect in custody giving an admissible statement, the suspect must be informed of: first, “the right to remain silent” Miranda, at 467-468, 86 S.Ct. 1602; second, “the explanation that anything said can and will be used against the individual in court,” id. at 469, 86 S.Ct. 1602; third, and most pertinent to our inquiry, “the right to consult with a lawyer and to have the lawyer with him during interrogation,” id. at 471, 86 S.Ct. 1602; and, fourth, “that if he is indigent a lawyer will be appointed to represent him.” Id. at 473, 86 S.Ct. 1602.
A verbatim recitation of the warnings as set out in Miranda is not required, and the Supreme Court has “never insisted that Miranda warnings be given in the exact form described in that decision.” Duckworth v. Eagan, 492 U.S. 195, 202, 109 S.Ct. 2875, 106 L.Ed.2d 166 (1989). “The inquiry is simply whether the warnings reasonably convey to a suspect his rights as required by Miranda.” Id. at 203, 109 S.Ct. 2875. While no exact language is required, informing an individual of his right to consult with a lawyer before interrogation and to have a lawyer present with him during interrogation “is an absolute prerequisite to interrogation.” Miranda, 384 U.S. at 471, 86 S.Ct. 1602.
This temporal requirement that the right to the lawyer attaches before and during any interrogation is key. In Duck-worth, supra, a Miranda warning was disputed because, after giving the defendant a proper Miranda warning, explaining that the defendant had the right to an attorney before and during questioning, the officers added the following additional language to the warning: “We have no way of giving you a lawyer, but one will be appointed for you, if you wish, if and when |15you go to court.” Duckworth, 492 U.S. at 198, 109 S.Ct. 2875 (italics removed). The defendant argued that the “if and when you go to court” language made the warning defective by implying that the right to an attorney did not apply until the defendant went to court. Duckworth found that the warning was adequate because it did state that the defendant had the right to consult with a lawyer before the police questioning. Id. at 205, 109 S.Ct. 2875. “[T]he initial warnings given to the respondent, in their totality, satisfied Miranda.” Id. at 205, 109 S.Ct. 2875.
Similarly, in Florida v. Powell, Tampa police advised the defendant:
You have the right to remain silent. If you give up the right to remain silent, anything you say can be used against you in court. You have the right to talk to a lawyer before answering any of our questions. If you cannot afford to hire a lawyer, one will be appointed for you without cost and before any questioning. You have the right to use any of these rights at any time you want during this interview.
— U.S. — , 130 S.Ct. 1195, 1200, 175 L.Ed.2d 1009 (2010), (emphasis added). While the officers advised the defendant that he had the right to consult with a lawyer before questioning, they failed to mention to the defendant that he also had the right to the presence of a lawyer during questioning.
The Supreme Court held that this warning was sufficient because the defendant knew he had the right to talk to a lawyer before answering any questions and also *915 knew he could exercise that right at any time during questioning. The warning “reasonably conveyed Powell’s right to have an attorney present, not only at the outset of interrogation, but at all times.” Id., — U.S. at -, 130 S.Ct. at 1205 (emphasis added).
In both cases the Supreme Court stressed the importance of the holding in Miranda that an “absolute prerequisite to interrogation” is the warning that “an individual held for interrogation must be clearly informed that he has the right to 11 (¡consult with a lawyer and to have the lawyer with him during interrogation.” Miranda, 384 U.S. at 471, 86 S.Ct. 1602.
C
We contrast the detective’s warning to Mr. Harris as he related it during the hearing with the absolute prerequisites of a constitutionally sufficient warning in order to highlight the deficiency in the warning given to Mr. Harris by Detective Durning. We focus on the requirement that a suspect be informed that his right to counsel applies before and during questioning.
Det. Durning testified that he gave the warnings to Mr. Harris from his unaided memory. When the prosecutor requested Det. Durning to repeat the warnings from the witness chair, the detective responded:
[1] [6] You have the right to remain silent.
[2] Anything you say can and will be used against you in a court of law. [3] You have the right to an attorney. [4] If you cannot afford an attorney one would be provided for you—one would be provided for you. [4] If you cannot afford one, one would be provided—excuse me. You have me on a spot here. You have the right—[expletive]
[[Image here]]
All right. [1] You have the right to remain silent. [2] Anything you say can and will be used against in a court of law. [3] You have the right to an attorney. [4] If you cannot afford an attorney, one will be provided for you. Do you understand the rights as I have read them to?
As recited by Det. Durning, the third warning is deficient. The warning does not clearly inform an individual that his right to counsel includes the right to talk to a lawyer before police-questioning and to have a lawyer present during police-questioning. See Miranda, 384 U.S. at 471, 86 S.Ct. 1602. “[T]his warning is an absolute prerequisite to interrogation.” Id.
|17“No effective waiver of the right to counsel during interrogation can be recognized unless specifically made after the [.Miranda warnings] have been given.” Id. at 470, 86 S.Ct. 1602. “The accused who does not know his rights and therefore does not make a request may be the person who most needs counsel.” Id. at 470-471, 86 S.Ct. 1602. Det. Dunning’s general statement that an individual has “the right to an attorney” without elaboration does not satisfy the requirement that a warning clearly inform an individual of his rights. See Windsor v. U.S., 389 F.2d 530, 533 (C.A.5 1968).
Where a detective testified in a statement-suppression hearing that he had read the defendant proper Miranda warnings from a card, but was unable to testify specifically which rights were read to the defendant, and he could not recite the Miranda warnings from memory, the Louisiana Supreme Court characterized such *916 evidence the State introduced to demonstrate that the detective adequately advised defendant of all of his rights required by Miranda “equivocal at best.” State v. Vigne, 01-2940, p. 8 (La.6/21/02), 820 So.2d 533, 539.
Because Det. Durning failed to adhere to an “absolute prerequisite to interrogation,” the warning that an interrogated individual’s right to counsel may be exercised before and during questioning, Mr. Harris’ statement made during the interrogation is constitutionally inadmissible.
D
The trial judge recognized the deficiency in Det. Dunning’s recitation, but nonetheless concluded both that Det. Durning knew the correct Miranda warnings and that he correctly relayed the Miranda rights to Mr. Harris at the time of his arrest. The trial judge stated that she believed the detective was “caught off guard” and “put on the spot” when asked to recite the warnings at trial.
[1RWe find that the trial judge abused her discretion in so deciding because the prosecution bore the burden of proof to show that Mr. Harris properly waived his rights and that the Miranda warnings were proper. See Miranda, 384 U.S. at 475, 86 S.Ct. 1602; La.C.Cr.P. Art. 703 D. The prosecution put forward no evidence that Det. Durning knew the proper Miranda warning or that he recited a proper warning at the time of Mr. Harris’ arrest. There is no evidence in the record to support the position that the detective was less “put on the spot” in the field than he was in the courtroom. Ordinarily, a trial court’s determination of whether Miranda rights were “knowingly and intelligently” waived should not be overturned on appeal absent a finding that the trial court abused its discretion. See State v. Green, 94-0887, p. 19 (La.5/22/95), 655 So.2d 272, 285; State v. Vigne, 01-2940 (La.6/21/02), 820 So.2d 533. But in the absence of any evidentiary support for the trial judge’s factual findings, as opposed to a situation in which the trial judge weighed evidence, we review the judge’s findings for an error of law. See, e.g., State v. Guillory, 10-1231, p. 6 (La.10/8/10), 45 So.3d 612, 616. See also State v. Wells, 08-2262, pp. 4-5 (La.7/6/10), 45 So.3d 577, 580-581 (explaining which trial court rulings are due deference and which are not).
Because there is no evidence to support the trial court’s finding that Det. Durning properly gave Mr. Harris his Miranda warning, this factual finding by the trial court is not entitled to the “great deference” normally granted to such a ruling. We, therefore, find that the trial court abused its discretion in finding that the prosecution met its burden of proving that Det. Durning informed Mr. Harris of all of his Miranda rights at the time of Mr. Harris’ arrest.
119^
Having found that the trial judge abused her discretion in her unsupported findings that Det. Durning knew the proper warning and relayed it to Mr. Harris, we turn to consider the relief which would be appropriate. The prosecution argues that we should evaluate the erroneous ruling under the harmless error test of Arizona v. Fulminante, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991).
Fulminante did authorize a reviewing court to evaluate whether the erroneous admission of a defendant’s statement at trial was harmless error. 499 U.S. at 297, 111 S.Ct. 1246. The Supreme in Fulminante Court noted that “[s]ince this Court’s landmark decision in Chapman v. California, 386 U.S. 18, 87 S.Ct. 824,17 L.Ed.2d 705 (1967) ... in which we *917 adopted the general rule that a constitutional error does not automatically require reversal of a conviction, the Court has applied harmless-error analysis to a wide range of errors and has recognized that most constitutional errors can be harmless.” Id. at 306, 111 S.Ct. 1246. The “common thread” connecting Supreme Court decisions that used the harmless-error analysis, however, is that in all the cases applying a harmless-error analysis the Supreme Court reviews “trial error.” Id. at 307, 111 S.Ct. 1246. “Trial error” is “error which occurred during the presentation of the case to the jury,” id., as opposed to a “structural defect,” which is one that “affect[s] the framework within which the trial proceeds, rather than simply an error in the trial process itself.” Id. at 310, 111 S.Ct. 1246. The Court held that the admission into evidence of an involuntary confession during trial is a “trial error.” Id. Our inquiry logically next turns to the question of whether the trial court’s acceptance of Mr. Harris’ conditional guilty plea was a “trial error” or a “structural defect.”
Trial error may be “quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond unreasonable doubt.” Id. at 307-308, 111 S.Ct. 1246. An appellate court reviewing the introduction of an involuntary statement at trial “simply reviews the remainder of the evidence against the defendant to determine whether the admission of the confession was harmless beyond a reasonable doubt.” Id. at 310, 111 S.Ct. 1246. The Court notes, “Of course an involuntary confession may have a more dramatic effect on the course of a trial than do other trial errors — in particular cases it may be devastating to the defendant.” Id. at 312, 111 S.Ct. 1246. But “a reviewing court will conclude in such a case that its admission was not harmless error.” Id. On the other hand, “[s]truc-tural defects occur in only ‘a very limited class of cases,’ and include the total deprivation of the right to counsel, lack of an impartial trial judge, unlawful exclusion of grand jurors of the defendant’s race, deprivation of the right to self-representation at trial, the right to a public trial, and erroneous reasonable doubt instructions.” State v. Langley, 06-1041, p. 6 (La.5/22/07), 958 So.2d 1160, 1164, quoting Johnson v. United States, 520 U.S. 461, 468, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997).
Unlike the defendant in Fulminante, Mr. Harris entered a conditional guilty plea, reserving his right to appeal the trial court’s pre-trial rulings. Mr. Fulminante’s complaint arose out of the in-trial introduction of an involuntary statement. Fulmi-nante, 499 U.S. at 283-284, 111 S.Ct. 1246. And Mr. Harris entered a qualified plea of guilty under State v. Crosby, 338 So.2d 584 (La.1976).
The purpose of allowing a qualified plea under Crosby “is to permit a fair and efficient method to review a central issue of a trial and a prosecution, in instances where the pre-plea ruling, if erroneous, mandates a reversal of any conviction which may result.” Id. at 591. A conditioned plea avoids the delay and expense of an unnecessary trial when the trial would serve as only a formality before the defendant could appeal his adverse pre-trial ruling. Id.
|^The error usually alleged in a qualified guilty plea is “a violation of a constitutional or statutory right which, for reasons beyond guilt or innocence, would mandate a reversal of any conviction resulting from a trial.” Id. A trial court generally will not permit a qualified guilty plea unless the allegedly erroneous eviden-tiary ruling “go[es] to the heart of the prosecution’s case.” Id. After a trial court accepts a qualified guilty plea, a reviewing court “will assume that the evi *918 dence questioned is of this prejudicial nature and will be offered at the trial, unless the record prior to the plea demonstrates otherwise.”[7] Id. Crosby, therefore, establishes a presumption that pre-trial error is not harmless. See also State v. Joseph, 03-315, p. 2 (La.5/16/03), 847 So.2d 1196, 1197 (per curiam) (quoting Crosby, 338 So.2d at 591) (Crosby was designed “to preserve review of evidentiary rulings which ‘go to the heart of the prosecution’s case’ that a defendant would otherwise waive by entering an unqualified guilty plea”).
Because the trial judge found this pre-trial ruling to be a sufficient basis to accept a conditional plea, see State v. Gillis, 07-1909 (La.App. 1 Cir. 3/26/08), 985 So.2d 745, Mr. Harris benefits from the presumption that his assignments of error would be grounds for the reversal of his conviction, should we find them to be correct. Thus, we reject the prosecution’s suggestion that we review the ruling for harmless error.
Even though reversal of the ruling and setting aside the guilty plea is the relief to which Mr. Harris is entitled, because it is not evident that the suppression of the statement without the suppression of the evidence of the cocaine would necessarily impel Mr. Harris to withdraw his guilty plea, we only reverse the trialj^court’s ruling on the motion to suppress the defendant’s statement and remand the matter to the district court for further proceedings to afford Mr. Harris, within thirty days of the finality of this judgment, to file a motion to withdraw his guilty plea. If he timely files such a motion, the trial court shall permit him to withdraw his guilty plea and proceed to a trial on the merits at which the cocaine evidence seized from his mouth would be admissible.[8] Of course, his statement to Det. Durning is suppressed and shall be excluded at trial.
DECREE
The trial court’s ruling on the motion to suppress the evidence of the cocaine is affirmed. The trial court’s ruling on the motion to suppress the statement of Terrell Harris is reversed, and this matter is remanded to the trial court.
AFFIRMED IN PART, REVERSED IN PART, AND REMANDED

. See State v. Crosby, 338 So.2d 584 (La. 1976). Mr. Lewis, it is noted, had previously applied for us to exercise our supervisory authority in connection with the pretrial rulings; we denied the application, noting that he had an adequate remedy on appeal in the event he was convicted. See State v. Harris, 2011-0246 (La.App. 4 Cir. 2/18/11) (unpub.).

. Notably, as we always do, we have reviewed the entire record for errors patent and have detected none. See La.C.Cr.P. art. 920(2).

. La.C.CrP. Art. 703 E(1) permits a defendant to testify at the hearing "without being subjected to cross-examination on other matters” and his testimony cannot be used by the prosecution "except for the purpose of attacking the credibility of the defendant's testimony at the trial on the merits.”

. Much has been made of the phrase "high crime area,” but little has been done to define it. High crime areas have been described as "places in which the character of the area gives color to conduct which might not otherwise arouse the suspicion of an officer.” State v. Buckley, 426 So.2d 103, 108 (La. 1983). It has also been qualified, as, for example, an "area in which many narcotics arrests have been made.” State v. Barney, 97-777, p. 5 (La.App. 5 Cir. 2/25/98) 708 So.2d 1205, 1207. It can be an area which is "the subject of on-going complaints.” State v. Flagg, 99-1004, p. 9 (La.App. 5 Cir. 4/25/00) 760 So.2d 522, 527. The Louisiana Fifth Circuit Court of Appeal has a practice of taking judicial notice that an area is one of high crime pursuant to La. C.E. 201. See, e.g., State v. Burns, 04-175, p. 9 (La.App. 5 Cir. 6/29/04), 877 So.2d 1073, 1078; State v. Miskel, 95-584, pp. 7-8 (La.App. 5 Cir. 1/30/96), 668 So.2d 1299, 1303. The First Circuit has done the same. See State v. Sterling, 479 So.2d 641, 643 (La.App. 1st Cir.1985). Some have questioned the utility and legality of an undefined "high crime” inquiry. See, e.g., State v. Cooper, 36,472, p. 4 (La.App. 2 Cir. 10/23/02), 830 So.2d 440, 445, n. 5.

. The bracketed numbers, which we insert, correspond with the four aspects of a proper Miranda warning. See Part II-B, ante.

. If the error alleged relates to the procedural conduct of the trial after the trial has begun, an appellate court will review an assigned error under the assumption that the error was harmless. Crosby, 338 So.2d at 591. "[H]e should not be able to obtain a reversal, despite his admitted guilt, because an incidental ruling may be erroneous but might not in the light of a full trial record constitute a cause for reversal.” Id.

. When the trial judge grants the defendant’s timely motion to withdraw his guilty pleas, the trial judge shall at the same time vacate the sentence imposed upon Mr. Harris. The trial judge sentenced Mr. Harris to five years in the custody of DOC, which was suspended, placed him on active probation for a period of five years, and explicitly imposed the sentence under the provisions of La. C. Cr.P. art. 893. If no motion is timely filed, the sentence imposed remains intact.