JOY COSSICH LOBRANO, Judge.
hThe defendant, Daron Lundy (“Defendant”), timely appeals his conviction of one count of armed robbery with a firearm, in violation of La. R.S. 14:64.3. In his sole assignment of error, Defendant asserts that the district court erred in denying his motion to suppress statement. After a thorough review of the record and the relevant jurisprudence, we find that the district court did not abuse its discretion in determining that Defendant knowingly and intelligently waived his Miranda rights when giving his statement to police, as we discuss fully below. We therefore find no error in the district court’s denial of the motion to suppress and thus affirm Defendant’s conviction and sentence.
Defendant was charged by bill of information on May 23, 2014 with one count of armed robbery with a firearm, a violation of La. R.S. 14:64.3.[1] On June 9, 2014, Defendant entered a plea of not guilty and was appointed counsel. On June 10, 2014, Defendant filed an omnibus motion for discovery, a motion to preserve evidence, a motion to suppress statement, evidence and identifications, and a motion for preliminary examination. On July 31, 2014, after hearing testimony from Officer Billy Tregle, Detective John Waterman, and Detective Drew Deacon, |2the district court denied Defendant’s motions, and Defendant objected. The district court also *589 found probable cause and set a trial date of September 16, 2014. After several continuances, trial was ultimately held on March 9,2015.
At trial, the victim of the armed robbery (“Victim”), testified that on March 17, 2014,[2] at approximately 11:00 p.m., he walked from a residence at Freret and Third Street to a gas station at the intersection of Claiborne Avenue and Martin Luther King, Jr.- Boulevard in New Orleans , where he obtained a $500.00 money order and bought groceries. As he walked home from the gas station, he encountered a female who asked him for change, and he handed her a one dollar bill. The female followed him and attempted to solicit him as he walked down First Street. Victim noticed that as he approached the intersection of First Street and Claiborne Avenue, the female was getting closer to him and was accompanied by three male individuals. When the group caught up to him, Victim stated he was “grabbed and shoved from behind into an alley, and then pinned up against a wall.” Victim observed that one of the males was armed with a black pistol, and he advised Victim not to fight. As he was pinned against the wall, the female emptied his pockets, which contained his wallet, his cellphone, and a Zip-po lighter.[3] The perpetrators took his cash and groceries, and the female also struck him three times. One of the men acted as a lookout, while the other helped the gunman maintain control of Victim. After the robbery, the female, the lookout, and the helper fled, and the gunman remained, at which time Victim “ducked and rolled Land got away from him” and called 911 with a spare cell phone in his jacket pocket.[4]
After police officers responded to the call, Victim provided descriptions of the perpetrators. The officers and Victim relocated to the location of the incident, and most of his belongings were recovered in that area. Victim returned to the gas station for cigarettes around 3:00 a.m. on the morning after the incident, at which time he noticed the male individual who previously served as the lookout standing near a market on First Street. Victim called the policé immediately.
The morning after the incident, Victim recounted the events of the armed robbery to an acquaiiitance from the neighborhood, and he learned that possible nicknames of the perpetrators were “Count” and “Carlos.” Victim testified that he provided that information to Detective John Waterman (“Det.Waterman”) of the New Orleans Police Department (“NOPD”) a few days later. Victim was subsequently shown a lineup, which he identified in court and which was admitted. From the lineup, Victim identified Defendant as the male who held him at gunpoint with his elbow across his throat, made a notation on the photograph, and was “very certain” and “positive” of this identification. Victim also identified Defendant in open court and the photographic lineup was admitted into evidence over defense objection.
Det. Waterman testified that on March 17, 2014, he was assigned to the Sixth *590 District of the NOPD to investígate an armed robbery that occurred in the vicinity of the intersection of First Street and Claiborne Avenue. Det. Waterman relocated to the intersection of First Street and Claiborne Avenue and spoke with RVictim. Det. Waterman was able to recover Victim’s wallet, Zippo lighter, and cell phone. Two nights after the armed robbery, Det. Waterman learned that Defendant was possibly one of the perpetrators, and he created a photo lineup. After Detective Drew Deacon (“Det. Deacon”) displayed the photo lineup to Victim, Victim identified Defendant from the lineup. With this information, Det. Waterman prepared an arrest warrant. Defendant was arrested on March 25, 2014, and brought to the Sixth District Police Station, where Det. Waterman read him his Miranda rights. At that time, Defendant elected to give a statement, which was recorded,[5] with both Det. Waterman and Sergeant Daniel Scanlan present. Over defense counsel’s objection, Defendant’s recorded statement was played in open court.
In Defendant’s recorded statement, provided on March 25, 2014, at 6:39 p.m., Defendant stated his name, and Det, Waterman read Defendant his Miranda rights. Defendant repeatedly denied any involvement in the armed robbery. Defendant stated that from approximately 6:00 p.m. on March 17, 2014, until 1:30 or 2:00 p.m. on March 18, 2014, he was at his girlfriend’s house on Jackson Street, where he spent time with his niece as well. Defendant, however, could not recall the last name of his girlfriend, whom he had been seeing for approximately three weeks. When asked where he lived, Defendant said that he had been staying at the Jackson Street residence for approximately one month. Defendant stated that, on the day in question, he watched movies on cable television and ate food, although he could not recall what he watched or what food he consumed. In the recorded [^statement, Defendant acknowledged that he was known by the nickname of “Count.”
Det. Waterman also testified that he went to the Jackson Street residence but was unable to confirm the statements made by Defendant in his recorded statement,[6] Det. Waterman testified that it was his understanding that three individuals were involved in the armed robbery— two males and a female. He did not recall a fourth suspect being mentioned by Victim, and when he reviewed his police report, the report included descriptions of only two males and a female. No results were obtained from the DNA analysis of Victim’s clothing, and no fingerprints were recovered. Det. Waterman further testified that no weapon was recovered from Defendant’s person.
Det. Deacon testified that he was assigned to the Sixth District Persons Crime Unit of the NOPD on March 17, 2014 and was present for Det. Waterman’s interview of Victim. Det. Deacon, had investigated Defendant previously, so he was aware that Defendant was known as “Count” and had advised Det. Waterman of this fact. Det. Deacon showed Victim the photo *591 graphic lineup prepared by Det. Waterman that included Defendant’s photograph. Det. Deacon identified the-lineup in open court, as well as Victim’s notation memorializing Defendant’s photograph as that of the perpetrator. Det. Deacon testified that Victim’s identification of Defendant was “[a]bsolute and immediate,” and Victim had no hesitation. Det. Deacon stated that Victim was not coerced in any way into making |f,the identification, nor did Det. Deacon suggest in any way who was the suspect in the photographs. Victim was given a folder with the photographs and permitted to review each photograph on his own.
Co-defendant Carlos Brass, also testified. Brass pled no contest to accessory to armed robbery, and as part of the plea, he agreed to testify against Defendant. Brass identified Defendant in open court and testified that he knew Defendant from the area for-years, could “[ejasily” recognize him, and he knew him. as “Count.” Brass stated that he saw Defendant on the night of March 17, 2014, in a yard adjacent to a “trap house” near the intersection of First Street and Claiborne Avenue. Brass observed Victim and a female “getting into it about money” and saw Defendant “pop up there by her side.” Brass testified that Defendant used his arm to pin Victim under his throat and asked Victim where .the money was. Brass observed a black pistol on Defendant’s person during the encounter, which Defendant pointed at Victim while continuing to ask for money. Brass observed Defendant remove the wallet from Victim’s pocket and remove cash •from the wallet. The female emptied the rest of Victim’s pockets and threw his property-over the fence.- Brass testified that polic'e officers spoke to him a few hours after the incident, but he was let go. When asked whether he was sure that Defendant committed, the armed robbery, Brass responded in the affirmative.
At the conclusion of Defendant’s trial, the district court found Defendant guilty as charged.[7] On March 18, 2015,- Defendant filed a motion for new trial which the district court denied.- On that same date, the district court sentenced Defendant to twenty years of hard labor, without benefit of probation, parole, or |7suspension of sentence and with credit for time served.[8] Defendant was -also assessed'$286.50 for felony court costs. This timely appeal follows.

ERRORS PATENT

This'Court reviews the record for errors patent and finds none. ' See Lá.C.Cr.P. art. 920(2).

DISCUSSION

In his sole assignment of error, the Defendant contends that the district court erred in denying his motion to suppress statement.
A defendant adversely affected may move to -suppress any statement from use at the trial on the merits on the ground that it was unconstitutionally obtained. La.C.Cr.P. art. 703(A). A district court’s ruling on a motion to suppress is entitled to great weight, considering the district court’s opportunity to observe the witnesses and weigh the credibility of their *592 testimony. State v. Robinson, 09-1269, at p. 5 (La.App. 4 Cir. 5/12/10), 38 So.3d 1138, 1141 (citing State v. Mims, 98-2572, at p. 3 (La.App. 4 Cir. 9/22/99), 752 So.2d 192, 193-194). In reviewing a trial court’s suppression ruling, an appellate court is not limited to evidence adduced at the hearing on the motion to suppress; it may also consider any pertinent evidence given at trial of the case. State v. Nogess, 98-0670, at p. 11 (La.App. 4 Cir. 3/3/99), 729 So.2d 132, 137 (citation omitted). Moreover, this Court has recognized that “[o]rdinarily, a trial court’s determination of whether Miranda rights were ‘knowingly and intelligently’ waived should not be overturned on 18appeal absent a finding that the trial court abused its discretion.” State v. Harris, 2011-0941, at p. 18 (La.App. 4 Cir. 8/2/12), 98 So.3d 903, 916.
Defendant argues that the recording of his statement that he provided to Det. Waterman evidences that he did not understand the Miranda[9] warnings as given; therefore his waiver of his right against self-incrimination should be deemed unknowing and his statement should not have been introduced at trial.
In State v. Harris, 2011-0941, at p. 13, 98 So.3d at 913, this Court recognized the well-settled standard for whether a defendant’s statement may be admitted at trial:
“If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel.” Miranda v. Arizona, 384 U.S. 436, 475, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), citing to Escobedo v. State of Illinois, 378 U.S. 478, 490, n. 14, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964).
“Since the State is responsible for establishing the isolated circumstances under which the interrogation takes place and has the only means of making available corroborated evidence of warnings given during incommunicado interrogation, the burden is rightly on its shoulders.” Id. (emphasis added). See also La.C.Cr.P. Art. 703 D (“the state shall have the burden of proving the admissibility of a purported confession or statement by the defendant”); State v. Thompson, 399 So.2d 1161, 1167-1168 (La.1981).
Thus, a defendant’s “statement during a custodial interrogation i[s] inadmissible at trial unless the prosecution can establish that the accused ‘in fact knowingly and voluntarily waived Miranda rights’ when making the statement.” Berghuis v. Thompkins, 560 U.S. 370, 130 S.Ct. 2250, 2260, 176 L.Ed.2d 1098 (2010), quoting North Carolina v. Butler, 441 U.S. 369, 373, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979).
“Voluntary” waiver is distinguishable from “knowing” waiver. “[W]aiver must be ‘voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.’” Berghuis, 560 U.S. at 382, 130 S.Ct. at 2260, quoting Moran v. Burbine, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986) ... [Knowing waiver [] requires inquiry into whether the statement was “ ‘made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.’ ”
Id. (citation omitted.)
Defendant submits that the recorded statement establishes that he became very upset while Det. Waterman read him his Miranda rights. Defendant’s sobs are au *593 dible on the recording. Defendant further asserts that he can be heard asking Det. Waterman, “What’s that for” when he was presented with the rights of arrestee form. Defendant contends that this question establishes that he was not paying attention, and that he failed to understand the waiver of rights as read to him by Det. Waterman. Defendant further argues that Det. Waterman erroneously instructed him, “If you want to enter anything on the record you have to verbally acknowledge and sign this form.” Defendant notes that, in response to this directive, he said, “I haven’t done nothing. I haven’t done anything, that’s my statement.” After Defendant repeated this remark, Defendant claims that Det. Waterman again advised Defendant, “If you want to put anything on the record you have to sign this form” and “If you want this statement to be admitted into the record you have to sign this form right here.”
Defendant submits that the State had the burden of proving beyond a reasonable doubt that Defendant made his statement freely and voluntarily, citing State v. Green, 94-887, at p. 8 (La.5/22/95), 655 So.2d 272, 279, and notes that pursuant to Harris, 2011-0941, at p. 13, 98 So.3d at 913, a voluntary waiver is distinguishable from a knowing waiver. Defendant concedes his statement was voluntary; he refutes, however, that the waiver of rights was knowingly made when 'he gave his statement.
1 mDefendant acknowledges that Louisiana courts have found that lower intelligence, illiteracy, and/or mental retardation do not prevent an individual from providing a knowing and intelligent waiver.[10] However, Defendant argues, the critical issue is whether an individual understands his Miranda rights. Defendant contends that the nature of his responses and his emotional state should have put Det. Waterman on notice that Defendant was not in a state of mind to understand the rights he was waiving. Furthermore, Defendant argues that during his recorded statement, he did not give an indication that he understood the rights he was waiv *594 ing, but rather only that he was putting something on the record. Accordingly, Defendant submits that the district court erred in failing to suppress his statement, which included an alibi that was subsequently contradicted and was therefore prejudicial to Defendant.
|nThe State argues that the record evidences that Defendant was advised of his Miranda rights, and Defendant also signed the rights of arrestee form. With respect .to Defendant’s argument that his emotional state and distress precluded Defendant from knowingly waiving his Miranda rights, the State submits that the Louisiana Supreme Court has held that mental retardation, low intelligence, and illiteracy alone do not preclude an individual from knowingly and intelligently waiving. Miranda rights. In support of this argument, the State cites State v. Brown, 414 So.2d 689 (La.1982) (holding that, in the case of a 17 year old attending special classes for the mentally disabled, “... Moderate mental retardation and low intelligence or illiteracy do not of themselves vitiate the ability to knowingly and intelligently waive constitutional rights ' and make a free and vpluntary. confession.”); State v. Brooks, 541 So.2d 801 (La.1989) (finding that defendant’s claim of mental deficiency did not prevent admission of his confession as diminished mental or intellectual capacity alone does not impair the ability to knowingly and intelligently waive constitutional rights); and State v. Tart, 93-0772, at p. 23 (La.2/9/96), 672 So.2d 116, 119, 126 (finding a defendant’s inculpatory statement admissible despite defendant’s argument that he was functionally illiterate and .emotionally disturbed, and thus incapable of knowingly and voluntarily waiving his constitutional rights (citing State v. Wilson, 467 So.2d 503, 519 (La.1985))).
The State further argues that emotional distress is not a ground for rendering a statement inadmissible unless the emotional distress is so acute that the statement is not voluntary, citing State v. Moseley, 587 So.2d 46, 51 (La.App. 2 Cir.1991) (holding that a defendant charged with second degree murder who cried and was upset when giving a confessional statement presented no evidence that he was 1^hysterical and thus unable to make a voluntary. choice to confess); State v. McKnight, 539 So.2d 952, 956 (La.App. 2 Cir.1989)(holding that a defendant’s emotional distress following stabbing of former husband was riot so severe as to render subsequent confession involuntary; although evidence indicated that defendant had consumed beer previously, officers testified that she exhibited no signs of intoxication, she was not hysterical, and was sufficiently rational to be concerned for granddaughter); and State v. Wiley, 513 So.2d 849, 854 (La.App. 2 Cir.1987) (finding that the inculpatory statements of a defendant who claimed he was in a confused mental state when the statements were made were-admissible. “Emotional distress is not grounds for rendering a confession inadmissible unless it is so severe that the party confessing is unable to voluntarily do so,”).
Additionally, the State relies upon State v. Knowles, 444 So.2d 611, 612-13 (La.1984), in support of its argument that emotional distress, while receiving a Miranda warning or giving a statement, does not automatically invalidate a statement. In Knowles, after being read his Miranda rights, the Defendant spoke to relatives on the telephone, “during which [time] he became emotionally upset and wept,” and the Defendant subsequently “blurted out” in the presence of the investigating officer that he killed the victim. Id. at 611-12. Defendant argued in part that his waiver of rights was not knowing or intelligent, *595 and his confession was ‘not voluntary, “because he was emotionally upset.” Id, at 612. However, the Court noted that both officers testified “that although the Defendant was upset he composed himself and intelligently responded to questions” when the Court affirmed the district court’s finding that the Defendant’s waiver was valid, and his confession was voluntary. Id. at 612-13.
In State v. Smith, 11-638, at p. 11 (La.App. 5 Cir. 3/13/12), 90 So.3d 1114, 1122, also cited by the State, the Fifth Circuit considered a defendant’s argument that “her distressed emotional state during the statements, her limited mental state evidenced by' her bizarre behavior throughout trial, -and the manner in which her statements were obtained rendered her statements involuntary.” The Smith court noted that the facts were similar to those in State v. Terrick, 03-515, at p. 12 (La.App. 5 Cir. 9/30/03), 857 So.2d 1153, 1160-61, also cited by the State in support of its argument:
In regard to her distressed emotional state, this Court addressed a similar scenario in State v. Terrick. There, a sixteen-year-old boy was convicted of second degree - murder and argued on appeal that his statement to police was not given knowingly and . voluntarily. The detective - testified that the defendant appeared upset during the statement and that he cried following the statement. Although this Court’s focus was on the effect of the defendant’s age on the voluntariness of his statement, this Court still took note of his distress, stating: “Defendant, who was apparently upset by the circumstances in which he found himself, at no time sought to discontinue the statement.” We concluded that his statement was freely and voluntarily given.
Smith, 11-638, at p. 11-12, 90 So.3d at 1122 (footnotes omitted).
The Smith court found that the same reásoning applied, noting that although the Defendant “was upset and cried intermittently throughout her statements,” the defendant never expressed an “indication that she wished to stop talking,” which was corroborated by recordings of the statements, “in which Smith’s statements appear voluntary and devoid of any invocation of her rights.” Id. at p. 12, 90- So.3d at 1122. Therefore, the defendant’s “distressed, emotional state did not render her statements involuntary.” Id.
The State also cites State v. Coleman, 48,168, at p. 6 (La.App. 2 Cir. 7/17/13), 121 So.3d 703, 707-08, wherein the defendant argued in part that her 114consent to make a statement to police “was not freely and voluntarily given” because “during the interrogation the detective and others ‘engaged in overreaching conduct, including the usé of fear, duress, intimidation, menaces, threats, inducements and/or promises’ ” and “factors such as her initial refusal to sign the waiver form, the charge of murder, her lack of sleep, hysteria and injury, and her constant requests to speak to her mother rendered her waiver and statements involuntary and inadmissible.” In Coleman, the Second Circuit held that the Defendant voluntarily made her recorded statement relying on the officer’s testimony about the circumstances of Defendant’s statement and the fact that the statement was recorded. Id. at 712. “While the recorded interview reveals a sometimes emotional defendant,, it also presents a coherent, articulate individual who was able to respond appropriately to the interrogation. .Although upset, Coleman was not apparently intoxicated or so distraught that she could not make a rational choice to waive her rights” Id. The court noted that Coleman’s voluntary *596 choice to waive her rights and speak to police was supported by the record. Thus, the district court’s decision to allow the statement into evidence was not erroneous. Id.
Finally, the State cites State v. Rains, 2012-615, at p. 15-16 (La.App. 3 Cir. 11/7/12), 101 So.3d 593, 604-05, wherein Defendant sought a motion to suppress her statement arguing it was not voluntary because, she was “visibly upset” when speaking with officers. On appeal, the Third Circuit referred to the district court’s oral reasons for denying the motion:
Based on the testimony that we have thus far, Ms. Rains was upset, she indicated that she was concerned about going to jail, and she made a statement that she did not know what to do. Not knowing what to do could relate to a lot of different things in that situation. Mr. Bullock indicated that in direct response to that statement, he |1fireminded her that she did not have to talk to him. There are things that indicate to me that Ms. Rains understood and knew what she was doing. She asked for permission to smoke a cigarette, and that was granted. She asked Detective Bullock not to record the statement, that was done. Had a significant amount of time passed from the accident to when this was given, I think it’s quite likely that this questioning occurred around 9:30 at night. If you compare the forms we have with when she was booked in to the detention center, I think that that is likely. But, I don’t think any of those factors indicate that she didn’t understand what she was doing, that she didn’t know that she could not assert her right to remain silent. There’s nothing to indicate that she was unaware that she could request counsel. To the contrary, it appears that while obviously upset, I think anyone would be upset in that situation, she elected to tell them what happened.
Id. (emphasis added.) Therefore, the Third Circuit found that the district court properly denied the Defendant’s motion to suppress. Id.
In State v. Harris, 2011-0941, at p. 14, (La.App. 4 Cir. 8/2/12), 98 So.3d 903, 914, this Court recognized the four essential elements for a valid Miranda warning:
A proper Miranda warning contains four separate parts. Prior to a suspect in custody giving an admissible statement, the suspect must be informed of: first, “the right to remain silent” Miranda, at 467-468, 86 S.Ct. 1602; second, “the explanation that anything said can and will be used against the individual in court,” id. at 469, 86 S.Ct. 1602; third, and most pertinent to our inquiry, “the right to consult with a lawyer and to have the lawyer with him during interrogation,” id. at 471, 86 S.Ct. 1602; and, fourth, “that if he is indigent a lawyer will be appointed to represent him.” Id. at 473, 86 S.Ct. 1602.
A verbatim recitation of the warnings as set out in Miranda is not required, and the Supreme Court has “never insisted that Miranda warnings be given in the exact form described in that decision.” Duckworth v. Eagan, 492 U.S. 195, 202, 109 S.Ct. 2875, 106 L.Ed.2d 166 (1989). “The inquiry is simply whether the warnings reasonably convey to a suspect his rights as required by Miranda.” Id. at 203, 109 S.Ct. 2875. While no exact language is required, informing an individual of his right to consult with a lawyer before interrogation and to have a lawyer present with him during interrogation “is an absolute prerequisite to interrogation.” Miranda, 384 U.S. at 471, 86 S.Ct. 1602.
*597 |1fiIn the case sub judice, we conclude that Defendant’s recorded statements were voluntary and knowingly made. On the recording, Det. Waterman can be heard properly advising Defendant of his Miranda rights, in compliance with Harris. Additionally, after Det. Waterman advised Defendant of those rights[11] and asked Defendant if he understood them, Defendant can be heard saying “yeah” after being prompted to verbally respond to the question. At the hearing on the motion to suppress, Det. Waterman testified that, after reading Defendant his Miranda rights, Defendant indicated that he understood those rights as they were read to him, and Defendant voluntarily signed the rights of arrestee form.
During the next several minutes of Defendant’s recorded statement, Defendant rationally responded to numerous questions posed by Det. Waterman and Sergeant Scanlan, and he provided a coherent account of his whereabouts and activities during the days surrounding the armed robbery. Defendant also responded to questions regarding co-defendant, Carlos Brass. Defendant, “although upset, was not apparently ... so distraught that [he] could not make a rational choice to waive [his] rights and speak to police.” Coleman, 48,168, at p. 15, 121 So.3d at 712.
Considering the foregoing, we find that the district court did not abuse its discretion in determining, after listening to the recorded statement and the testimony at trial, that Defendant knowingly and intelligently waived his Miranda rights. Det. Waterman can be clearly heard listing each of the Miranda rights to Defendant, and Defendant can be heard responding in the affirmative when asked whether he understood those rights. Defendant did not present any evidence to |l7establish that he was not capable of understanding the rights as they were read to him. Although Defendant sounds upset at the beginning of the recorded statement, Defendant “composed himself and intelligently responded to questions.” Knowles, 444 So.2d at 612. Thus, Defendant’s “emotional distress ... w[as] not so great as to vitiate the free and voluntary nature of his statements.” State v. White, 399 So.2d 172, 175 (La.1981). Additionally, Defendant signed the rights of arrestee form.
With respect to Det. Waterman’s statement that Defendant needed to sign the rights of arrestee form to make a statement on the record, this Court considered a similar issue in State v. Williams, 2013-1300, at p. 6 (La.App. 4 Cir. 6/4/14), 144 So.3d 56, 60, wherein the defendant contended that he did not knowingly and intelligently waive his rights when he signed the Voluntary Statement Form because a detective “deceptively informed him that by signing the Voluntary Statement Form, ‘it’s not admitting to any guilt; it’s just saying that I basically read my — we read you your rights, that you understand them, and if you wish to speak to me, you can.’ ” This Court, relying on Colorado v. Connelly, 479 U.S. 157, 167, 107 S.Ct. 515, 522, 93 L.Ed.2d 473 (1986), found that because the defendant failed to rebut the detective’s testimony that he did not force, coerce, or threaten the defendant into signing the form, and because the defendant failed to prove any signs of coercion or force, the defendant voluntarily signed the Voluntary Statement Form.[12] Similarly, in this case, *598 Defendant' did not present evidence that he was coerced into | issigning the waiver of rights form; rather, Defendant asserted in his appellate brief that the issue was not whether the waiver of rights was voluntary, but whether it was a knowing waiver.
Accordingly, we find that the district court did not abuse its discretion in determining that Defendant knowingly and intelligently waived his Miranda rights when giving his statement to police. We thus affirm Defendant’s conviction and sentence.
CONVICTION AND SENTENCE AFFIRMED

. A co-defendant, Carlos Brass, was also similarly charged in the same bill of information.

. Defendant’s brief-erroneously indicates that the armed robbery occurred on March 17, 2013.

. The three items were recovered by the police and were admitted as the State's exhibits 4, 5, and 6. The State’s exhibit 7 included the black jacket and black jeans that Victim was wearing the night of the incident. Detective John Waterman testified that the clothing was confiscated to test for possible DNA analysis.

. Rogell Lewis, a 911 operator with the NOPD, testified as the custodian of records for the 911 calls. He verified the incident number, item number and CD containing the 911 call.

. At a July 31, 2014 hearing, Det. Waterman stated that Defendant's statement was recorded in an audio recorder as well as on a video recorder. However, only the audio recording was made part of the appellate record.

. At the1 July 31, 2014, motion hearing, Det. Waterman testified that when he interviewed the individuals Defendant named as spending the day and night with during the time of the armed robbery, the individuals contradicted Defendant’s account and “stated that [Defendant] did not spend all day with them. He did not spend the night [and] he did not watch T.V. They said he stopped by for about an hour in the early evening but not overnight.”

. Defendant elected to have a bench trial rather than one by jury.

. Fifteen years of Defendant’s sentence was imposed with respect to the armed robbery, with an additional five years enhancement, to run consecutively, relative to the use of a firearm being used in commission of the crime pursuant to La. R.S. 14:64.3(B). Defendant was subsequently sentenced as a third felony offender to sixty-six years at hard labor, without benefit of parole, probation or suspension' of sentence, with credit for' time served. The multiple bill sentencing, however, is not before this Court in this appeal.

. Miranda v. Arizona, 384 U.S. 436, 475, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. Defendant cites State v. Grady, 47,622, p. 10 (La.App. 2 Cir. 1/16/13), 108 So.3d 845, 852 (holding that a mildly mentally retarded defendant "was minimally competent to understand and waive his Miranda rights”). Recently, in State v. Tucker, 2013-1631, at p. 27 (La.9/1/15), 181 So.3d 590, 613, petition for cert. filed, 84 USLW 3435 (U.S. Jan. 26, 2016)(No. 15-946), the Louisiana Supreme Court recognized a string of Supreme Court cases wherein illiterate or low-intelligence individuals validly waived their Miranda rights:
For comparison, see State v. Green, 94-0887, pp. 7-19 (La.5/22/95), 655 So.2d 272, 278-84 (mildly intellectually disabled defendant’s waiver of rights was knowing and intelligent, even though psychologist testified defendant was unable to comprehend his rights; psychologist also testified defendant was educable and could be made 'to understand rights, police officers testified defendant understood his rights in part because of his prior criminal history); State v. Istre, 407 So.2d 1183, 1186-87 (La.1981) (19-year-old who had I.Q, of 68 and who did not know his own age intelligently waived rights, which were explained in simplistic terms that he apparently understood); see also State v. Brown, 414 So.2d 689, 696 (La,1982) (‘"[M]oderate mental retardation and low intelligence or illiteracy do not of themselves vitiate the ability to knowingly and intelligently wáive 'constitutional rights and make a free and voluntary confession,.’ ”) (citations omitted); but see State v. Anderson, 379 So.2d 735, 736 (La. 1980) (finding that the fact that defendant was an illiterate, unemployed 17-year-old with the mental age of 8 and an I.Q. of between- 50 and 69, coupled with ambivalent police testimony about whether he ever understood the rights they attempted to explain to him, supported a conclusion that he was incapable of understanding his rights or the ramifications of foregoing them; hence, there was no knowing, intelligent waiver.)

. At the hearing on the motion to suppress, Det. Waterman testified that he read Defendant his Miranda rights directly from the rights of arrestee form.

. The defendant in Williams also argued that he did not knowingly sign the form because the detective did not provide a complete Miranda warning because the detective failed to state whether he read the defendant his rights *598 or whether the defendant read those rights himself. This Court noted that "the jurisprudence has recognized that it is not necessary for an officer to read a defendant his rights if the record otherwise indicates that the defendant was informed of his rights.” Williams, 2013-1300, at p. 8-9, 144 So.3d at 61. Accordingly, this Court found that because the Voluntary Statement Form signed by the defendant “contained a full recitation of the Miranda warnings’’, coupled with the detective's testimony, the defendant "understood his rights and that he was knowingly waiving these rights." Id. at p. 9, 144 So.3d at 61.