STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

19-507

STATE OF LOUISIANA

VERSUS

RAY DONALD BRISTER, JR.

**********

APPEAL FROM THE
THIRTY-FIRST JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON DAVIS, NO. CR-108-17
HONORABLE STEVE GUNNELL, DISTRICT JUDGE

**********

VAN H. KYZAR
JUDGE

**********

Court composed of John E. Conery, Van H. Kyzar, and Candyce G. Perret, Judges.

AFFIRMED IN PART; REVERSED IN PART; CONVICTIONS AND
SENTENCES SET ASIDE; AND REMANDED

Paula Corley Marx
Louisiana Appellate Project
P. O. Box 82389
Lafayette, LA 70598-2389
(337) 991-9757
COUNSEL FOR DEFENDANT/APPELLANT:
    Ray Donald Brister, Jr.

Michael Cade Cassidy
District Attorney - 31st JDC
Bennett R. LaPoint
Assistant District Attorney
P. O. Box 1388
Jennings, LA 70546
(337) 824-1893
COUNSEL FOR PLAINTIFF/APPELLEE:
    State of Louisiana

**KYZAR, Judge.**

Defendant, Ray Donald Brister, Jr., appeals following his convictions and sentences for manslaughter and possession of a firearm by a convicted felon. For the reasons herein assigned, we affirm in part, reverse in part, set aside the convictions and the sentences on each, and remand to the district court for proceedings consistent herewith.

## FACTS AND PROCEDURAL HISTORY

Defendant was charged by Bill of Information filed February 13, 2017 with one count of manslaughter in violation of La.R.S. 14:31(1) and one count of possession of a firearm by a convicted felon in violation of La.R.S. 14:95.1. On November 13, 2018 Defendant entered an *Alford*[1] plea to both counts of the bill of information, with an agreed upon sentencing cap of thirty-five years. The plea was entered pursuant to *State v. Crosby.*[2]

The facts of the case leading to the plea show that on December 25, 2016, Lake Arthur police received a report that a person had been shot. Upon arrival, Officer Scott Patch found a male lying on the ground with a gunshot wound to his chest. There were a number of people around the victim, and the officer asked if anyone saw who had shot the victim. Certain members of the crowd responded that Defendant was the shooter, after which Officer Patch placed Defendant under arrest. Police interviewed Defendant and learned that he and the victim, Shaft Quinn Francis, were first cousins, that Defendant and Francis had been arguing prior to that date, and that the two had continued to argue on Christmas day. Defendant later shot the victim while arguing again. Defendant claimed the shooting was in self-defense.

---

[1] *North Carolina v. Alford*, 400 U.S. 25, 91 S.Ct. 160 (1970).
[2] *State v. Crosby*, 338 So.2d 584 (La.1976).

During the course of the case, Defendant filed a motion to suppress his confession or inculpatory statement given to Assistant Police Chief Terrie Guillory of the Lake Arthur Police Department on the date of the homicide. He urged in the written motion filed in the trial court that "[t]he statements which may incriminate the defendant were made within a short time of the incident[,]" that " the video recording shows the defendant was crying, his hand were shaking, he was having trouble breathing and was obviously highly emotional disturbed and mentally upset by what had just transpired[,]" and that "because of his highly distraught state and the short time lapse between the incident and the interview any waiver of his [*Miranda*] rights and agreement to speak to police without an attorney present was not knowingly and intellectually done." Following the hearing on November 13, 2018, the trial court denied the motion.

Defendant also filed a motion in support of his claim of self-defense to permit him to introduce at trial evidence of hostile acts of the victim towards Defendant, including overt acts immediately preceding the crime and two previous incidents. That motion was also heard on November 13, 2018. At the conclusion of the testimony of Defendant and arguments of counsel, the trial court denied the motion.

Defendant later entered his plea reserving his right to appeal the rulings of the trial court denying his motions. The plea was entered with an agreement that the maximum sentence Defendant was exposed to would be a total of thirty-five years in prison. He was sentenced on January 28, 2019 to serve twenty-five years at hard labor for the offense of manslaughter and, in addition, he was ordered to serve ten years at hard labor without the benefit of parole, probation or suspension of sentence for the offense of possession of a firearm by a convicted felon, with the two sentences to run consecutively with each other. Defendant filed a motion to vacate his sentence and for resentencing; which motion was denied.

2

This appeal followed, wherein Defendant urges three assignments of error as follows:

> 1. The trial court erred in denying the Motion to Suppress the statement of Ray Donald Brister, Jr. which was not freely and voluntarily given due to the circumstances and Ray Brister's highly emotional state at the time.
>
> 2. The trial court deprived Ray Donald Brister, Jr. of his constitutional right to present a defense when it denied the defense motion to present evidence of the victim's dangerous character, including evidence of prior hostile encounters.
>
> 3. Should this honorable court find review of the adverse rulings discussed in assigned errors No. 1 and 2 precluded due to the failure of defense counsel to specify on the record which rulings were preserved pursuant to *State v. Crosby*, Mr. Brister was denied effective assistance of counsel for counsel's failure to articulate which rulings were being preserved for review on appeal.

## ERRORS PATENT

This Court reviews the record for errors patent and finds two. *See* La.Code Crim.P. art. 920(2). First, the sentencing court failed to impose the sentence for possession of a firearm by a convicted felon at hard labor even though a sentence for that offense must be served at hard labor. La.R.S. 14:95.1. Thus, the sentence is illegally lenient. *See State v. Perkins*, 13-245 (La.App. 3 Cir. 11/6/13), 124 So.3d 605. Second, the sentencing court was required to impose a fine of not less than one thousand dollars nor more than five thousand dollars for Defendant's conviction of possession of a firearm by a convicted felon. La.R.S. 14:95.1. The trial court failed to impose the mandatory fine, rendering the sentence for possession of a firearm by a convicted felon illegally lenient for this reason as well. However, considering our decision herein vacating Defendant's convictions and sentences, these errors are moot.

3

## DISCUSSION

### *Ineffective Assistance of Counsel*

We first consider assignment of error number three wherein Defendant contends that counsel was ineffective, in the event this court determines that no issues were preserved for appeal due to counsel's failure to specify which errors were being reserved at the time of the entry of his plea pursuant to *State v. Crosby*. Specifically, Defendant asserts that if this court is precluded from reviewing assigned errors one and two, counsel was ineffective.

The Louisiana Supreme Court granted a defendant's writ application on this issue in *State v. Joseph*, 03-315 (La. 5/16/03), 847 So.2d 1196. The *Joseph* defendant did not specifically reserve the pre-trial rulings on which he sought appellate review. The court stated:

> Granted. A defendant's failure to specify which pre-trial rulings he desires to reserve for appeal as part of a guilty plea entered pursuant to *State v. Crosby*, 338 So.2d 584 (La.1976), may limit the scope of appellate review but should not preclude review altogether. *See Crosby*, 338 So.2d at 586 ("If we are not able to afford the accused their bargained-for appellate review, we must set aside the guilty pleas . . . . because of the non-performance of the plea bargain (or the impossibility of the state to perform it) by virtue of which the plea was obtained."); *see also State v. Singleton*, 614 So.2d 1242, 1243 (La.1993) ("To the extent that counsel also reserved appellate review of sentence as part of the guilty plea, denial of that review . . . would jeopardize the voluntariness of those pleas."). Absent a detailed specification of which adverse pre-trial rulings the defendant reserved for appellate review as part of his guilty plea, an appellate court should presume that the trial court permitted a *Crosby* reservation no broader than necessary to effectuate the underlying purpose of conditional guilty pleas, *i.e.*, to preserve review of evidentiary rulings which "go to the heart of the prosecution's case" that a defendant would otherwise waive by entering an unqualified guilty plea. *Crosby*, 338 So.2d at 591. Such rulings typically include denial of a motion to suppress evidence or a confession and exclude rulings which may affect the conduct of trial but "which do not substantially relate to guilt, such as the denial of a continuance or severance." *Id.* In the present case, to avoid jeopardizing the voluntariness of the defendant's guilty plea, the court of appeal should afford defendant review of the trial court's denial of his motion to suppress the evidence but need not address his second

4

assignment of error relating to the trial court's denial of his motion for a continuance.

*Id.* at 1196-97. Nevertheless, this court distinguished *Joseph*, 847 So.2d 1196, in *State v. Cummings*, 07-1304, pp. 6-7 (La.App. 3 Cir. 4/30/08), 983 So.2d 246, 251, *writ denied*, 08-1187 (La. 2/20/09), 1 So.3d 489:

> We cite *Joseph* in order to do a thorough review of this appeal. Even though we cite the case, we find that it does not apply to the instant case for two reasons. First, Defendant specifically reserved the right to contest the ruling on his motion to suppress at the time he pled guilty, and he was silent as to the trial court's denial of his motions for discovery. We shall not extend the *Joseph* rule to instances when, at the time of his guilty plea, the defendant made a specific reservation of pre-trial judgments to contest on appeal and assigned error to a judgment not contained in that reservation.
>
> Second, even if we would apply *Joseph*, Defendant is not entitled to a review of the ruling denying him access to the recording of the drug transaction. The only charges against Defendant arise from events occurring on the day following the drug transaction, and examination of the record does not reveal any notice by the State that it intended to introduce other crimes evidence at trial, so the denial of the CI evidence does not substantially relate to Defendant's guilt on the charged offenses.
>
> Therefore, Defendant waived this claim when he failed to specifically reserve his right to contest the trial court's denial of his motions for discovery.

Here, Defendant did not specifically reserve one issue for appeal and raise an additional, unreserved issue as did the *Cummings* defendant. Additionally, this court essentially found, in its second reason for not applying *Joseph*, 847 So.2d 1196, that the ruling of which the defendant sought review on appeal was irrelevant to the guilt or innocence of the defendant as to the charges for which he pled guilty. The State did not intend to use the other crimes evidence with which the discovery motion dealt.

The ruling in *Joseph*, 847 So.2d 1196, specifically allows an appeal of the denial of Defendant's motion to suppress even though Defendant did not specifically preserve the issue. Further, the issue of whether Defendant could admit evidence in

support of his claim of self defense goes to the heart of the issue of his guilt. In contrast, in *Cummings*, 983 So.2d 246, the subject of Defendant's *Prieur*[3] motion was not relevant to the charged offenses. Accordingly, this case is distinguishable from *Cummings*, while *Joseph* applies to allow consideration of Defendant's assignment of error on appeal related to the denial of his ability to introduce evidence of the character of the victim.

Having concluded the propriety of the consideration of Defendant's assignments of error as to the rulings on the motion to suppress and the denial of evidence of the character of the victim of the offense, as discussed below, this third assignment of error is moot.

### Admissibility of the Confession

Defendant argues that the trial court erred in denying the motion to suppress his inculpatory statement as he claims it was not freely and voluntarily given due to the circumstances and his highly emotional state at the time it was given. At the hearing on the motion to suppress on November 13, 2018, the State and counsel for Defendant stipulated that the only issue that is being raised by the motion is whether or not there was a knowing and intelligent waiver of Defendant's rights in making the inculpatory statements, as depicted on the DVD of the statements. After reviewing the videotape of the statement and listening to arguments of counsel, the trial court denied the motion, providing the following reasons:

> All right. I had an opportunity to - - to review the video, okay. Yes, Mr. Brister was emotional in the video. He was questioned as to knowing his *Miranda* rights. It was gone over with him again. He even stated that he had been read his *Miranda* rights I'd say I think he said 20 times, but anyway. But what was more important for the Court is whether or not he was able to make an intelligent waiver at that time. And I have to look at the - - his answers to questions that were asked were very detailed. He knew what was going on. He knew what had happened, and he knew what he was saying. So, at this time, the Court

---

[3]277 So.2d 126 (La.1973).

6

finds that the waiver of an attorney was voluntary, knowingly, and intelligently done. So I'm denying your motion to suppress, okay.

Before a confession or inculpatory statement of a defendant can be introduced into evidence at his or her trial, "it must be affirmatively shown that it was free and voluntary, and not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises." La.R.S. 15:451. If the statement is a product of custodial interrogation, the state additionally must show that the defendant was advised before the questioning of his right to remain silent, that any statement he makes may be used against him, and that he has a right to either retained or appointed counsel. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602 (1966). In a hearing on a motion to suppress, "the burden of proof is on the defendant to prove the ground of his motion, except that the state shall have the burden of proving the admissibility of a purported confession or statement by the defendant[.]" La.Code Crim.P. art. 703(D).

> A trial court's finding as to the free and voluntary nature of a statement carries great weight and will not be disturbed unless not supported by the evidence. *State v. Benoit*, 440 So.2d 129, 131 (La.1983); *State v. English*, 582 So.2d 1358, 1364 (La.App. 2nd Cir.1991), *writ denied*, 584 So.2d 1172 (La.1991). Credibility determinations lie within the sound discretion of the trial court and its rulings will not be disturbed unless clearly contrary to the evidence. *Vessell*, [450 So.2d 938 (La.1984)]. When deciding whether a statement is knowing and voluntary, a court considers the totality of circumstances under which it is made, and any inducement is merely one factor in the analysis. *State v. Lavalais*, 95-0320, p. 6 (La.11/25/96), 685 So.2d 1048, 1053; *State v. Lewis* 539 So.2d 1199, 1205 (La.1989); *State v. Thomas*, 461 So.2d 1253 (La.App. 1st Cir.1984), *writ denied*, 464 So.2d 1375 (La.1985).

*State v. Blank*, 04-204, p. 10 (La. 4/11/07), 955 So.2d 90, 103, *cert. denied*, 552 U.S. 994, 128 S.Ct. 494 (2007).

> The question of voluntariness of a confession, including a determination of the defendant's psychological state of mind, will be answered from the facts and circumstances of each case. *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). Thus, the admissibility of a confession is, in the first instance, a question for the

7

trial judge. His conclusions on the credibility and weight of the testimony will not be overturned on appeal unless they are not supported by the evidence. *State v. Gaines*, 354 So.2d 548 (La.1978).

*State v. Williams*, 383 So.2d 369, 372 (La.1980).

At the hearing on the motion to suppress, the DVD of the questioning of the Defendant and his responses was introduced into evidence via the stipulation of the State and counsel for Defendant. The best evidence of the statement and the events surrounding it is the unaltered DVD itself. *State v. Auzenne*, 305 So.2d 507 (La.1974); *State v. Joe*, 502 So.2d 270 (La.App. 3 Cir.1987). A review of that tape shows clearly that Defendant was indeed advised of his *Miranda* rights and shows his acknowledgement and waiver of those rights.

After the trial court viewed the video, Defendant argued the interview took place shortly after the traumatic shooting. Defendant's breath was short and labored, and his hands were shaky. He was crying throughout the video. Defendant argued these physical signs showed his waiver of his rights including his decision to speak to officers without an attorney was not knowingly and intelligently made because of his emotional state of mind.

The State acknowledged Defendant was very upset about what happened, but it pointed out that his emotional state was caused by what Defendant had just done, not by any actions of the State. The State argued Defendant was coherent, gave responsive answers to questions, and corroborated details of the incident.

The trial court agreed that Defendant was emotional, but noted Defendant was read his *Miranda* rights and answered very detailed questions. The trial court felt Defendant "knew what was going on. He knew what had happened, and he knew what he was saying." Thus, the trial court found Defendant's waiver of an attorney was "voluntary, knowingly, and intelligently done[,]" and it denied the motion to suppress.

8

Our review of the videotaped confession verifies the trial court's findings. Defendant was understandably distraught; he had very recently killed his cousin, who he said he loved. Although much of the video shows Defendant breaking down, crying uncontrollably, and praying for forgiveness and mercy, Defendant is alone in the interrogation room during that time. When he is actually being questioned, he is crying, breathing heavily, and shaking, but he is also answering each question clearly. He describes the events and details of the evening in a clear and relatively calm manner despite being understandably upset. Defendant says on tape that he had been read his rights about twenty times, and he says he understands them when they are read to him yet again. He says he wants to tell what happened.

In *State v. Nargo*, 15-779 (La.App. 3 Cir. 6/1/16), 193 So.3d 1263, *writ denied*, 16-1313 (La. 5/19/17), 220 So.3d 748, the defendant confessed to two murders while being questioned by deputies. During the interrogation, which was recorded, the defendant was visibly upset and crying. He argued on appeal that his confession was inadmissible. Therein, another panel of this court held as follows:

> Although Nargo cried during questioning, we find no indication that this emotional distress was so great that it overcame the free and voluntary nature of Nargo's confession. *See State v. Weeks*, 345 So.2d 26 (La.1977) (where the court found that despite defendant's contention that the statements were involuntary because she was upset and stressed, the record amply supported a finding that the defendant was sufficiently in possession of her mental faculties to make the statements voluntary).

*Id.* at 1271.

In *State v. Beck*, 445 So.2d 470 (La.App. 2 Cir.), *writ denied*, 446 So.2d 315 (La.1984), the defendant also argued that her emotional upset and condition negated the voluntariness of her confession. The trial court denied her motion to suppress. On appeal, the decision was upheld, with the second circuit elaborating as follows:

> Emotional distress is not grounds for rendering a confession inadmissible unless it is so severe that the party confessing is unable

9

to voluntarily do so. See *State v. Williams*, 383 So.2d 369 (La.1980). While defendant cried and trembled during her interrogation, she did not become overly emotional or lose control. The record supports the trial court's finding that defendant's emotional distress did not affect the voluntariness of her confession.

*Id.* at 474.

In *State v. Smith*, 11-638 (La.App. 5 Cir. 3/13/12), 90 So.3d 1114, the defendant argued that statements given to police were not free and voluntary because of her emotional state and the use of improper questioning methods. She claimed that the shock and distress she was experiencing in the immediate aftermath of the victim's death caused her to be visibly upset and sometimes non-responsive during her questioning, and nothing was done to ascertain her mental condition or to insure that she understood her rights.

> In regard to her distressed emotional state, this Court addressed a similar scenario in *State v. Terrick*. There, a sixteen-year-old boy was convicted of second degree murder and argued on appeal that his statement to police was not given knowingly and voluntarily. The detective testified that the defendant appeared upset during the statement and that he cried following the statement. Although this Court's focus was on the effect of the defendant's age on the voluntariness of his statement, this Court still took note of his distress, stating: "Defendant, who was apparently upset by the circumstances in which he found himself, at no time sought to discontinue the statement." We concluded that his statement was freely and voluntarily given.
>
> In the instant case, although Smith was upset and cried intermittently throughout her statements, a review of the transcript reveals no indication that she wished to stop talking. In addition, the interviewing detective in the present case testified that Smith was of clear mind and that she understood what was transpiring. This is further corroborated by a review of the cassette tapes, in which Smith's statements appear voluntary and devoid of any invocation of her rights. Consequently, we find that Smith's distressed, emotional state did not render her statements involuntary.

*Id.* at 1122 (footnotes omitted).

In *State v. Lundy*, 15-776, pp. 11-12 (La.App. 4 Cir. 5/25/16), 195 So.3d 587, 594-95, *writ denied*, 16-1198 (La. 5/19/17), 219 So.3d 335, the fourth circuit found

that the district court did not abuse its discretion in determining, after listening to the recorded statement and the testimony at trial, that the defendant there knowingly and intelligently waived his *Miranda* rights, and in so doing, reviewed a multitude of jurisprudence as to the issue.

The State further argues that emotional distress is not a ground for rendering a statement inadmissible unless the emotional distress is so acute that the statement is not voluntary, citing *State v. Moseley*, 587 So.2d 46, 51 (La.App. 2 Cir.1991) (holding that a defendant charged with second degree murder who cried and was upset when giving a confessional statement presented no evidence that he was hysterical and thus unable to make a voluntary choice to confess); *State v. McKnigh*, 539 So.2d 952, 956 (La.App. 2 Cir.1989) (holding that a defendant's emotional distress following stabbing of former husband was not so severe as to render subsequent confession involuntary; although evidence indicated that defendant had consumed beer previously, officers testified that she exhibited no signs of intoxication, she was not hysterical, and was sufficiently rational to be concerned for granddaughter); and *State v. Wiley*, 513 So.2d 849, 854 (La.App. 2 Cir.1987) (finding that the inculpatory statements of a defendant who claimed he was in a confused mental state when the statements were made were admissible. "Emotional distress is not grounds for rendering a confession inadmissible unless it is so severe that the party confessing is unable to voluntarily do so.").

Additionally, the State relies upon *State v. Knowles*, 444 So.2d 611, 612-13 (La.1984), in support of its argument that emotional distress, while receiving a *Miranda* warning or giving a statement, does not automatically invalidate a statement. In *Knowles*, after being read his *Miranda* rights, the Defendant spoke to relatives on the telephone, "during which [time] he became emotionally upset and wept," and the Defendant subsequently "blurted out" in the presence of the investigating officer that he killed the victim. *Id.* at 611-12. Defendant argued in part that his waiver of rights was not knowing or intelligent, and his confession was not voluntary, "because he was emotionally upset." *Id.* at 612. However, the Court noted that both officers testified "that although the Defendant was upset he composed himself and intelligently responded to questions" when the Court affirmed the district court's finding that the Defendant's waiver was valid, and his confession was voluntary. *Id.* at 612-13.

Similarly, we find that there was no error in the trial court's decision that the Defendant's statement was freely and voluntarily given after being fully advised of his rights. The videotaped confession does not show a mental state that precluded a free and voluntary confession. Although Defendant does appear emotional in the

11

video and highly stressed by what he had done, he also appears to understand what was going on around him and the consequences of what he had done. The video shows no intimidation, menaces, threats, inducements, or promises from the officer questioning Defendant. Accordingly, we find no error in the decision of the trial court denying Defendant's motion to suppress the confession.

*Denial of Evidence of Hostile Demonstrations/Overt Acts of the Victim*

Defendant next asserts that the trial court erred when it denied his motion to present evidence of the victim's dangerous character, including evidence of his prior hostile encounters, such that he was denied his constitutional right to present a defense to the charges against him.[4] We agree.

> The Sixth and Fourteenth Amendments to the United States Constitution and Article I, § 16 of the Louisiana Constitution guarantee the criminally accused a meaningful opportunity to present a complete defense. *State v. Blank*, 04-0204, p. 49 (La.4/11/07), 955 So.2d 90, 130, *cert. denied*, 552 U.S. 994, 128 S.Ct. 494, 169 L.Ed.2d 346 (2007). Under La.Code Evid. art. 403, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice...." A district court judge enjoys broad discretion in admitting or excluding evidence on relevancy grounds. *State v. Miles*, 402 So.2d 644, 647 (La.1981).

*State v. Dressner*, 08-1366, p. 15 (La. 7/6/10), 45 So.3d 127, 137-38, *cert. denied*, 10-752 (La. 3/7/11), 562 U.S. 1271, 131 S.Ct. 1605.

Generally, evidence of the good or bad character of the victim of a crime is inadmissible and more specifically, "in the absence of evidence of a hostile demonstration or an overt act on the part of the victim at the time of the offense charged, evidence of his dangerous character is not admissible[.]" La.Code Evid. art. 404 (A)(2)(a). Further, and more specific to the case at hand, "[i]n the absence of evidence of a hostile demonstration or an overt act on the part of the victim at the

---

[4] Defendant's motion sought introduction of evidence of prior threats and acts by the victim towards him, in addition to evidence of a prior conviction of the victim for aggravated battery. Defendant's appeal, however, does not address the aggravated battery conviction, thus waiving any alleged error in the trial court's ruling in connection therewith.

12

time of the offense charged, evidence of the victim's prior threats against the accused or the accused's state of mind as to the victim's dangerous character is not admissible[.]" La.Code Evid. art. 404 (B)(2).

> A trial court's ruling on the admissibility of evidence is reviewed for an abuse of discretion. *State v. Cosey*, 97-2020 (La.11/28/00), 779 So.2d 675, 684. This same standard is applied to rulings on the admission of other crimes evidence and evidence under La. C.E. art. 412.2. *State v. Merritt*, 04-204 (La.App. 5 Cir. 6/29/04), 877 So.2d 1079, 1085, *writ denied*, 04-1849 (La.11/24/04), 888 So.2d 228; *State v. Humphries*, 40,810 (La.App. 2 Cir. 4/12/06), 927 So.2d 650, 656, *writ denied*, 06-1472 (La.12/15/06), 944 So.2d 1284.

*State v. Wright*, 11-141, pp. 10-11 (La. 12/6/11), 79 So.3d 309, 316.

At the hearing on the motion, Defendant set forth the details of the previous encounters with the victim that he asserts amounted to evidence of the victim's dangerous character by hostile demonstrations or overt acts by the victim towards him that should have been admitted in his defense. He testified that in November 2016 he was with another couple at 533 New Orleans Street, which was family owned property, when he had an encounter with the victim Francis, whom Defendant referred to as Shaft, and that Francis told him that "when he gets his hands on me he is going to kill me for using --- letting his name come out of my mouth." He stated further that Francis tried to physically grab or assault him by reaching into the car where Defendant sat in the rear passenger area, but that Defendant moved to the other side of the car to a place that Francis could not reach him. He then detailed the events of a second incident, as follows:

> It occurred on December the 23rd of 2016. I was backed in on the family property. It was around 2:00 o'clock in the morning, and [Francis] pulled up and told me I couldn't be parking on that property. Don't know why, but he said I couldn't be on that property. And I told him I didn't have to go anywhere because it was family property. So he told me one more time he said either you going to move this car or I'm going to do something to you. So I said I'm not going nowhere. So he went to his car and popped the trunk, and he came back with something he was hiding on the side behind his back and he swung the hammer - - it was a hammer that he was trying to hit me in the head

13

with, and I closed the door, and it put a dent in my girlfriend's car on the top side of the driver's side.

Defendant further testified that on December 25, 2016, the date of the offense, he and another individual went to his Uncle Augie's house to bring his uncle some beer, and stated that "[Francis] had came[sic] from down the road and was walking towards me making threats toward me, so I got in the car, closed the door, and I called my mother to see if she could come down there and try to talk to him to defuse the situation." Defendant then left the area and, while away, armed himself with a pistol, but returned a short time later to a location approximately two blocks from where the victim was. Thereafter, Defendant stated the following occurred:

> When I pulled up, [Francis] was down there talking to my mother and them, and I could hear him screaming and cursing at them, and he got up and took his shirt off and started walking towards me, and my sister was trying to stop him, and she kept on - - he kept on throwing her from side to side, and I'm begging him to leave me alone because there's no reason he should be messing with me. I've never done anything to him. But he constantly messes with me. He constantly picks on me and threatens me.

> . . . .

> As he approached me, I never did move from inside the -- the door, the driver's side door and the car. I never moved from there. The only thing I did was whenever he got close to me he -- I turned and he grabbed me and he started choking me. That's whenever I had reached in the back - - my back and tried to shoot him in the left shoulder, but being that I couldn't breathe - - it's like I was blacking out whenever I pulled the trigger.

On cross examination, Defendant was questioned about his opportunity to retreat from any confrontation with Francis.

A     [Francis] was down the road.

Q     How far down the road was he?

A     I think he was, like, at the family property. I was parked like two or three lots down.

Q     Okay. So where - - where [Francis] was, he was like two or three lots away from where you went?

14

A     Yeah, but before he was on 6th - -

Q     No, but please answer my question.

A     Yes, sir.

Q     Am I right in saying that?

A     Yes, sir.

Q     He was two blocks away, right, to the place you were going to?

A     Uh-huh (yes).

Q     And you knew that Shaft Francis was there, didn't you?

A     Yes, sir.

Q     And you went there knowing that you had a gun?

A     Yes, sir.

Q     And so when you got there, I think you said you saw [Francis] coming, right?

A     After we had got out of the car.

Q     But you saw [Francis] coming, right?

A     (Witness nods head affirmatively.)

Q     Yes?

A     Yes.

Q     And you were in your car, right?

A     I was standing outside of my car.

Q     It was your car, right?

A     I was standing outside of my car.

Q     When you saw [Francis], you could have gotten in your car, right?

A     Yes, sir.

Q     But you didn't get in your car, did you?

15

A     No, sir.

Q     You decided to stay there and confront him, didn't you?

A     It wasn't about that.

Q     But you decided to stay there and confront him, right? You didn't leave, so you decided to stay there and wait for him to come to you, right?

A     Yes, sir.

Q     And you knew you had a gun?

A     Yes, sir.

Q     And so you were waiting for him to come back to you, weren't you?

A     No, sir.

Q     You could have left, couldn't you?

A     Yes, sir, but I - -

Q     There was nothing to stop you from leaving, right?

A     Yes, sir.

Q     So when you saw him coming towards you, you made no efforts whatsoever to withdraw from what you see was a possible confrontation between you and [Francis]? You did nothing to withdraw, right?

A     No, sir.

However, on re-direct, the following colloquy was exchanged adding additional detail to Defendant's testimony:

Q     How long do you - - do you estimate it was from the time [Francis] saw you until he got to your car?

A     About two or three minutes.

Q     And during that time, weren't your sister and your mother - - your sisters and your mother out there as well?

A     Yes, sir.

Q     And, in fact, didn't he shove them out the way to get to you?

16

A    Yes, sir.

Q    Now to leave the property, wouldn't you have had to drive towards where [Francis] was - -

A    Yes, sir.

Q    - - was coming from?

A    Yes, sir.

The State introduced no evidence at the hearing. However, the trial court had just listened to the videotaped confession of Defendant in connection with the motion to suppress heard immediately prior to the hearing on Defendant's motion. In the videotaped confession, Defendant said he told the victim he had a gun, and he asked the victim to please stop. He said he was standing between the car and the car door, and he picked up the gun after he stood up to get out of the car. The victim was coming toward him at that time. Defendant said he was afraid of the victim, who had beaten him up before. In the videotaped statement, Defendant states that he fired the gun only after Francis told Defendant he would have to "pop me to stop me" and only after Francis had grabbed him by the neck.

The trial court denied the motion, commenting:

> From the testimony I've heard, testimony on the *Prieur* hearing, okay, he was an aggressor 'cause he came back, all right. So if - - if I find under *Prieur* that he was the aggressor, then the - - the other incidents will not come in, okay. All right. Now, you can argue in front of the jury, and they - - they'll get jury instructions as to that, okay, but as for you introducing these other statements is denied under the *Prieur*, okay.

Defendant argues that he established that the victim committed an overt act just prior to the offense that would allow evidence of the previous acts to be admitted at trial. Keeping the evidence out, he asserts, severely limited his ability to argue a self-defense claim to the jury.

17

In contrast, the State contends Defendant's testimony established he was the aggressor. Thus, he could not claim the victim's death was in self-defense without showing he withdrew from the conflict. The State argues Defendant's testimony showed he had the opportunity to withdraw but made no effort to do so.

Defendant's brief further contends that the testimony of Evelyn and Shonita Brister supports his claim of self-defense and his argument that the trial court erred in denying his motion. That testimony, however, was not offered at the hearing of the motions but instead was elicited at the sentencing hearing on January 28, 2019. The trial court did not have the benefit of the testimony in ruling on the motion. It is well settled that a new basis for an objection cannot be raised for the first time on appeal. *State v. Fowlkes*, 352 So.2d 208 (La.1977); *State v. Williams*, 343 So.2d 1026 (La.1977); *State v. Robertson*, 358 So.2d 931 (La.1978). This includes new evidence offered for the first time on appeal as an additional basis for Defendant's objection. *Id.* Thus, we do not consider the testimony of these two additional witnesses.

Defendant sought a plea of self-defense and attempted to offer in support the evidence presented at the hearing of the prior threats and acts and the alleged hostile actions of the victim at the time of the offense. Louisiana Revised Statutes 14:20 A(1) and (2) provide that a homicide is justifiable "[w]hen committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger" or "[w]hen committed for the purpose of preventing a violent or forcible felony involving danger to life or of great bodily harm by one who reasonably believes that such an offense is about to be committed and that such action is necessary for its prevention."

18

When self-defense is raised as an issue by the defendant, the state has the burden of proving, beyond a reasonable doubt, that the homicide was not perpetrated in self-defense. A homicide is justifiable when committed in self-defense by one who reasonably believes he is in imminent danger of losing his life or receiving great bodily harm and the killing is necessary to save himself from that danger. La.R.S. 14:20(A)(1). A person who is the aggressor or who brings on a difficulty cannot claim the right of self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that he desires to withdraw. La.R.S. 14:21.

When the defendant challenges the sufficiency of the evidence in such a case, the question becomes whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that the homicide was not committed in self-defense or in defense of others.

Evidence of a person's character or a trait of his character, such a moral quality, is generally inadmissible for the purpose of proving that he acted in conformity therewith on a particular occasion. La. C.E. art. 404(A). An exception is a homicide case where the defendant claims self-defense and at issue is whether the deceased was the aggressor and the defendant's state of mind. In such a case, evidence of the victim's dangerous character or threats against the accused is relevant because it tends to show the victim was the aggressor and the defendant's apprehension of danger was reasonable.

As a condition of admissibility, the defendant must produce evidence that at the time of the incident, the victim made a hostile demonstration or committed an overt act against the defendant. The term "overt act" as used in connection with prosecutions where self-defense is asserted means any act of the victim which manifests to the mind of a reasonable person a present intention on the part of the victim to kill or to do great bodily harm. The overt act must be directed at the accused at the time of the incident. Once appreciable evidence of an overt act or hostile demonstration is established, evidence of threats and of the victim's dangerous character is admissible for two distinct purposes: (1) to show the defendant's reasonable apprehension of danger which would justify his conduct; and, (2) to help determine who was the aggressor in the conflict.

*State v. Palmer*, 45,627, pp. 10-13 (La.App. 2 Cir. 1/26/11), 57 So.3d 1099, 1104-05, *writ denied*, 11-412 (La. 9/2/11), 68 So.3d 526 (citations omitted).

The trial court reasoned that the decision in this case turns on who was the aggressor, Defendant or the victim. The trial court found Defendant was the aggressor because he returned to the scene of the conflict, armed with a firearm,

19

knowing the victim would likely be there. Thus, the trial court denied Defendant's motion to allow evidence of the victim's prior acts against him at trial. The trial court's analysis, however, goes to the heart of the self-defense issue, rather than the admissibility of the evidence of the victim's prior threats and actions towards Defendant, i.e., dangerous character evidence so as to support his self-defense plea.

Essentially, the trial court here used the aggressor doctrine to determine, as a matter of fact, that Defendant was not entitled to urge self-defense in the first place, rather than determining whether Defendant could further his self-defense plea by introducing evidence of the victim's prior threats and acts against him. This was not the proper analysis for the issue. A homicide is justifiable "[w]hen committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger." La.R.S. 14:20(A)(1). Further, a person claiming justifiable homicide has "no duty to retreat under certain circumstances and can meet 'force with force;' however, the amount of force employed must still be reasonable under the circumstances presented" as per the provisions of La.R.S. 14:20(C) and (D). *State v. Gasser*, 18-531, p. 16 (La.App. 5 Cir. 7/3/19), 275 So.3d 976, 988. "A person who is the aggressor or who brings on a difficulty cannot claim the right of self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that he desires to withdraw and discontinue the conflict." La.R.S. 14:21. However, "[n]ot every act of a defendant will make him or her an aggressor. It is the character of the act coupled with the intent of the defendant that determines whether the defendant is the aggressor." *State v. McGee*, 51,977, p. 12 (La.App. 2 Cir. 4/3/19), *writ denied*, 19-761 (La. 11/19/19), 282 So.3d 1066 (citing *State v. Spivey*, 38,243 (La. App. 2 Cir. 5/12/04), 874 So.2d 352). Further, "[t]he act of aggression which would thereafter preclude asserting the right

20

of self-defense must be such that the response elicited from the victim by the aggressive act can be termed a reasonable response to that act." *State v. Gonday*, 442 So.2d 703, 706 (La.App. 1 Cir. 1983). For example, "[i]f a defendant curses a victim and the victim pulls a gun to kill the defendant certainly the defendant is not precluded by the original aggressive act of cursing from killing the victim in order to save his own life" and thus "[u]nder these circumstances the victim's response to the aggressive act would be unreasonable." *Id.*

While Defendant here indeed returned to the general area after the initial verbal confrontation on December 25, and had retrieved a weapon for his defense, he did not in fact return to the immediate area where he had previously encountered Francis. Although the trial court concluded that Defendant was the aggressor for returning, it is equally clear that Francis did not have to leave the location that he was at to approach and confront Defendant. By approaching Defendant, then grabbing him and choking him, as alleged by Defendant without contradiction by the State at the hearing, there was evidence of a hostile demonstration or overt act on the part of Francis so as to allow for the admissibility of the other acts of November 2016 and December 23, 2016.

In *State v. Simmons*, 349 So.2d 273, (La.1977), the supreme court reversed the conviction of the defendant finding the trial court erred in sustaining the State's objection to questions concerning the dangerous character of the deceased on the ground that no proper foundation had been laid; i.e., there was no "evidence" of an overt act.[5] The court set forth the law and the evidence required for the admissibility of such evidence, as follows:

---

[5] The case involved the application of La.R.S. 15:482, which at the time provided as follows: "In the absence of evidence of hostile demonstration or of overt act on the part of the person slain or injured, evidence of his dangerous character or of his threats against accused is not admissible."

21

In order to introduce evidence of the decedent's dangerous character or of his threats against the accused, the defendant must first present appreciable evidence tending to establish a hostile demonstration or an overt act on the part of the decedent which act or demonstration creates in the mind of a reasonable person a belief that he is in immediate danger of losing his life or of suffering great bodily harm. The inquiry is not whether in fact the decedent was going to inflict great bodily harm on the defendant, but whether the defendant reasonably was in apprehension of an attack by the victim. In the absence of evidence (not proof) of hostile demonstration or of overt act by the victim, evidence of his threats or dangerous character is not admissible.

*Id.* at 274 (citations omitted).

The court in *Simmons* reviewed the evidence that established that a fight had already occurred between the defendant and the decedent victim on the night of the shooting in which the defendant was badly beaten. The two men had also been involved in a fight some months before the night of the incident. Both men left the scene of the fight prior to the killing, promising that they would return. The defendant testified that the decedent had told him that he was going to go home, get his gun, and come back and kill the defendant. The defendant testified that he replied that he could go home too. Afterwards, the defendant returned and was waiting at a cook shed when the victim drove up with his wife. The victim's wife testified that she saw the defendant and that she was certain that her husband had also. The defendant testified that when the victim and his wife drove up, he saw the victim's wife take a pistol out of her purse and give it to her husband, after which the victim got out of the passenger side of the car and turned toward the defendant. The defendant then fired at the victim. The defendant testified: "Yes, sir, when he went to turn, that is when I shot, because I had seen the gun and knowed[sic] that he was going to shoot me." *Id.* at 275. The victim's wife testified at trial that she had not given her husband a gun.

22

In his per curiam, the trial judge in *Simmons* found that the only evidence of an overt act was the defendant's testimony that the victim had turned toward him. The trial judge found that this testimony was uncorroborated, unsupported by other evidence, and completely self-serving. He also found that no pistol was found at the scene of the crime or on the victim. Therefore, he concluded that the "unsupported, self-serving statement of defendant was not 'evidence' of an overt act which would justify the introduction of the evidence offered." *Id.* However, evidence was also adduced at trial through the testimony of a deputy off the Richland Parish sheriff's office, called as a witness for the State. As the first deputy to arrive at the hospital to which the victim was brought, he was informed by the treating physician that the victim's right hand pants pocket had been emptied. The deputy went to the victim's car and discovered a basket of blood-stained clothing in the back seat. The deputy found a lighter, some money and a pistol together in the basket about midway down in the clothing. When asked by the deputy who these objects belonged to, the victim's wife replied that the gun was hers but that she didn't know where the other articles had come from. At trial, however, she testified that while she and the victim were being driven to the hospital, she took the money out of her husband's pocket and put it in the basket. She also explained that it was her habit to always carry a gun with her and that she had done her laundry that day and had left the gun in the basket.

> The testimony of Deputy Cumpton and the contradictory testimony of Mrs. Ignont does tend to corroborate the defendant's testimony and, taken together with the defendant's testimony, constitutes appreciable evidence of an overt act or hostile demonstration. Therefore, the defendant should have been permitted to elicit testimony as to the victim's dangerous character or of his threats against the accused.

*Id.* at 275.

23

Just as the court concluded in *Simmons*, we find the evidence adduced at the hearing from Defendant constitutes appreciable evidence of a hostile demonstration or overt act on the part of the victim so as to support the admissibility of the threats and acts of November 2016 and December 23, 2016. The only testimony offered as to the events that occurred that day was that of Defendant. The State produced no testimony or evidence other than the videotaped confession to dispute Defendant's version of the events. Defendant left the area that night after the first encounter with the victim. When he returned to a nearby area, he was not immediately where Francis was but when Francis did discover that Defendant was there, he sought out Defendant, throwing Defendant's sister off him. He then approached the door of Defendant's vehicle, grabbed him, and started choking him. Defendant never left the immediate area of his vehicle. He claims to have shot the victim after the victim started choking him, and Defendant could not breathe.

The State has the burden of disproving the homicide was committed in self-defense. *Palmer*, 57 So.3d 1099. The State's argument and the trial court's determination that Defendant was actually the aggressor simply by returning to the area goes to the ultimate issue of whether Defendant properly acted in self defense, usurping the role of the jury. The trier of fact in this case, the jury, could find Defendant was the aggressor in doing so such that the killing was not justified, or it could find the victim, Shaft Francis, was the aggressor and, thus, self-defense justified the killing. The jury must also determine whether Defendant reasonably believed he was in imminent danger of death or great bodily harm and had to save himself from the danger by use of the firearm. He testified he tried to shoot the victim in the shoulder, but his aim was affected by the victim's attack. Again, the State offered no evidence to disprove Defendant's version of the incident other than the videotape, which does not totally contradict the statements as to the events

24

surrounding the incident. All of these are rightfully questions for the jury, however; as opposed to the question of whether there was adequate evidence of an overt or hostile act on the part of Shaft Francis at the time of the incident so as to permit the introduction of the prior-acts evidence.

We find the trial court committed an abuse of discretion in misapplying the standard of admissibility of the evidence of the victim's dangerous character by failing to determine whether there was appreciable evidence that the victim committed an overt act directed at Defendant at the time of the incident. We find the evidence is appreciable of such acts on the day of the crimes as alleged. Therefore, the evidence of the victim's prior threats and his dangerous character as may be shown through the November 2016 and December 23, 2016 incidents as described by Defendant in his testimony would be admissible at Defendant's trial to show who was the aggressor and whether Defendant had a reasonable apprehension of danger to justify his conduct. As such, Defendant was deprived of his constitutional right to present a potential defense at his trial. Accordingly, we reverse the decision of the trial court as to this issue, set aside Defendant's convictions and sentences, and remand to the trial court for further proceedings consistent herewith.

## DECREE

For the reasons set forth herein, we affirm the decision of the trial court finding Defendant's confession or inculpatory statement made December 25, 2016 admissible, but reverse the decision declaring the incidents as between Defendant and the victim in November 2016 and December 23, 2016 as described in the hearing to be inadmissible. Accordingly, Defendant's convictions and sentences are set aside and this matter is remanded to the trial court for proceedings consistent herewith.

25

**AFFIRMED IN PART; REVERSED IN PART; CONVICTIONS AND SENTENCES SET ASIDE; AND REMANDED.**